JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

California Homeless Union, Sausalito Chapter;Robbie Powelson, Sherie L McGruder,Michael Arnold, Arthur

**(b)** County of Residence of First Listed Plaintiff    Marin
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Anthony D. Prince, General Counsel for California
Homeless Union; Law Offices of Anthony D. Prince,

## DEFENDANTS

City of Sausalito, Jill James Hoffman, Mayor; Marcia Raines, City Manager; John Rohrbacher; Chief of Police;

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
       THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Arthur Friedman, Sheppard Mullin Law Firmm

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section1983
Brief description of cause:
Deprivation of right to bodily integrity by clearing homeless encampment and thereby increasing the risk of exposure to COVID-19

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.    **DEMAND $**      CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE         DOCKET NUMBER

DATE
February 16, 2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

1  Anthony D. Prince (SBN # 202892)
   General Counsel, California Homeless Union/Statewide Organizing Council
2  Law Offices of Anthony D. Prince
   2425 Prince Street, Ste. 100
3  Berkeley, CA 94705
   Tel: 510-301-1472
4

5  Attorneys for Plaintiffs

Page
- 1 -

**UNITED STATES COURT**

6
**NORTHERN DISTRICT OF CALIFORNIA**

7

8  SAUSALITO/MARIN COUNTY CHAPTER )  **Case No.:**
   OF THE CALIFORNIA HOMELESS UNION )
9  on behalf of itself and those it represents; )  ***EX PARTE* APPLICATION FOR**
   ROBBI POWELSON; SHERI I.McGREGOR; )  **EMERGENCY TEMPORARY**
10 MICHAEL ARNOLD; ARTHUR BRUCE; )  **RESTRAINING ORDER AND**
   MELANIE MUASOU; SUNNY JEAN YOW; )  **PRELIMINARY INJUNCTION TO HALT**
11 NAOMI MONTEMAYOR; MIKE NORTH )  **EJECTMENT OF HOMELESS PERSONS**
   and JACKIE CUTLER on behalf of )  **FROM DUNPHY PARK, SUSPEND**
12 themselves and similarly situated homeless )  **ENFORCEMENT OF CITY OF**
   persons, )  **SAUSALITO RESOLUTION No. 6008, and**
13 )  **COMPEL COMPLIANCE WITH STATE**
   )  **AND COUNTY COVID-19 PUBLIC**
14              Plaintiffs )  **HEALTH ORDERS;**
   )  **COMPLAINT FOR INJUNCTIVE AND**
15       vs. )  **DECLARATORY RELIEF UNDER the**
   )  **FOURTEENTH AMENDMENT TO THE**
16 CITY OF SAUSALITO; MAYOR JILL )  **UNITED STATES CONSTITUTION,**
   JAMES HOFFMAN; POLICE CHIEF JOHN )  **CALIFORNIA CONSTITUION ART.1, §7**
17 ROHRBACHER; CITY MANAGER )  **AND 42 U.S.C. § 1983;**
   MARCIA RAINES; DEPT. OF PUBLIC )  **DECLARATIONS IN SUPPORT**
18 WORKS SUPERVISOR KENT BASSO, )  **APPLICATION; DECLARATION OF**
   individually and in their respective official )  **COUNSEL;**
19 capacities, )  **[Proposed] ORDER**
   )
20              Defendants. )
   )
21 )
   )
22 )
   )
23 )

24              **INTRODUCTION BACKGROND FACTS**

25       1.       The SAUSALITO/MARIN COUNTY LOCAL of the CALIFORNIA HOMELESS

26 UNION, on behalf of itself and those it represents; and individual plaintiffs Robbie Powelson,

27 Sherie L. McGregor, Arthur Bruce, Michael Arnold, Melanie Muasou, Sunny Jean Yow, Naomi

28 Montemayor, Mike North, Jackie Cutler and Mike North, on behalf of themselves and all similarly

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

situated homeless persons, ("Plaintiffs") bring this Emergency Action for a Temporary Restraining Order and Preliminary Injunction against the CITY OF SAUSALITO, CALIFORNIA and, in both their individual and official capacities, respectively, JILL JAMES HOFFMAN, Mayor of the City of Sausalito, JOHN ROHRBACHER, Chief of Police, MARCIA RAINES, Sausalito City Manager, KENT BASSO, Supervisor of the Sausalito Department of Public Works and DOES 1 -100. (collectively, "Defendants") to enjoin Defendants' unlawful imminent expulsion of approximately twenty (20) homeless persons encamped in or adjacent to Dunphy Park. Plaintiffs have been safely and socially distanced encamped, fed and provided with life-saving survival items for over 45 days as the COVID-19 pandemic continues to infect and claim the lives of the most marginalized and vulnerable members of the community.

2.      Now, by passing Resolution No. 6008 -- which, here, has the force and effect of an ordinance -- the City seeks not only the destruction of the current Dunphy Park encampment, but has targeted the entire the entire homelessness community by broadly prohibiting sleeping, camping and "storage" of personal property in every inch of the City of Salinas. (See, Exhibit A).  As discussed more fully below, the City's imminent action, per Notices to Vacate posted on February 9, 2021, the forced removal of the Dunphy Park homeless could begin as early as this morning, February 16, 2021. Plaintiffs' proposal to opposing counsel to briefly suspend clearing of the encampment in order to attempt informal resolution was rejected. (See, Declaration of Attorney Anthony D. Prince)

3.      Defendants had earlier rejected detailed verbal warnings provided by Plaintiffs' counsel and almost forty (40) Sausalito citizens at the February 5, 2021 meeting of the Sausalito who presented evidence-based opposition to what was that same evening, i.e., Resolution 6008, instructing various city departments to begin the process of clearing the homeless from Dunphy Park.

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

4.      By flaunting COVID-related public health orders and guidelines from the state, county and the Centers for Disease Control (CDC) expressly prohibiting the break-up of encampments during the current pandemic, Defendants have shown deliberate indifference to a known, potentially deadly threat to the health, safety and the very lives of a disfavored population among the most vulnerable to the worst contagion in one hundred years. (See, Exhibit D). Accordingly, the looming state-created danger gives Plaintiffs no choice but to bring the instant *Ex Parte* Application for immediate injunctive relief.

5.      In late December, 2020, the County of Marin, in which the City of Sausalito is located, announced Governor Newsom's decision to lift the statewide shelter in place order. (See, Exhibit C) However, on that same day and in the same official statement, Marin County warned "One thing that has not changed is the need to practice caution in deciding when to leave our homes and for what purpose. The virus is still present in our community, and even people without symptoms can have COVID-19 and give it to others [and]we urge all residents to ***adhere to state guidelines*** as closely as possible to ***minimize the spread of COVID-19*** and help ***reduce impacts to our most vulnerable residents."***  As Magistrate Judge Susan van Keulen ruled last month granting a preliminary injunction to halt the clearing of a large Santa Cruz encampment, "At least on other appellate court has held that the CDC Guidelines 'provide the authoritative source of guidance on prevention and safety mechanisms for a novel coronavirus in a historic global pandemic where the public health standards are emerging and changing' *Mays v. Dart*, 974 F.3d 810,823 (7th Cir. 2020) (Exhibit C).[1] See Exhibit E.

---

[1] **Excerpted from Marin County Risk Protection Order (Exhibit C)**

**Staying Home Is the Best Way to Reduce Risk.** All people are strongly reminded that continuing to stay home as much as possible is the best way to prevent the risk of COVID-19 transmission, and therefore trips and activities outside the home should be minimized. All activities that involve contact with people outside of one's household increase the risk of transmission of COVID-19. Older adults (those age 65 or older) and individuals with serious underlying medical conditions (including immunocompromised state, chronic kidney disease, chronic obstructive pulmonary disease,

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

6.      On February 5, 2021, the Sausalito City Council, citing to City Code 13.28.010,

enacted Resolution 6008. Prior to the City Council Meeting of Feb. 5, 2021, California Homeless

Union Lead Organizer and General Counsel D. Prince sent and had entered into the official record a

true and correct copy of the January 20, 2021 Order of Federal Magistrate Judge for the Northern

District Susan van Keulen granting a preliminary injunction halting the imminent closing of a 200-

person homeless encampment in the case *of Sacramento Homeless Union, et al. v. [Santa Cruz City*

*Manager] Martin Bernal, City of Sacramento, et al*, Case No. 20-cv-09425-SVK. (See Exhibit E).

7.      If Defendants are not restrained, the closure of this homeless encampment will

separate almost two dozen unhoused individuals from an area where they have had access to food,

clothing, vital hygiene necessities and other support and the relative physical security of a

community where they have largely complied with COVID-19 protective measures such as social

distancing, mask wearing and spacing of individual tents. Not only will the homeless be placed at

heighted risk, made to wander the streets, congregate with people they do not know and become

hidden such that medical attention becomes impossible, but the community at large will also be

endangered because, as the U.S. Centers for Disease Control has consistently advised since the

pandemic began, the breakup of homeless encampments not only "separates the unhoused from

services," but "contributes to community spread." (See Exhibit D.) For this reason, and those

additionally set forth below, Plaintiffs pray that this Court will grant the relief sought.

---

obesity, serious heart conditions, sickle cell disease, and diabetes) are especially encouraged to minimize activities and interactions with people outside their household to the extent practicable.

The scientific evidence shows that, at this stage of the pandemic, it remains essential to maintain limitations and conditions to slow virus transmission to help: (a) protect the most vulnerable; (b) prevent the health care system from being overwhelmed; (c) prevent long-term chronic health conditions associated with COVID-19, such as cardiovascular, kidney, and respiratory damage and loss of limbs from blood clotting; and (d) prevent deaths. These limitations and conditions are necessary to slow the spread of the COVID-19 disease, preserving health care capacity in the County and advancing toward a point in the current public health emergency where transmission can be controlled.

**JURISDICTION AND VENUE**

8.      This is an action for injunctive relief pursuant to 42 USC Section1983 and F.R.Civ.P. 23(b)(2) based upon ongoing violations and the imminent harm to homeless residents of Dunphy Park and adjacent areas in the City of Santa Cruz, California based upon the violation of rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States Constitution as well as corresponding protections under the California Constitution and pandemic-related health orders and guidance provided by the State of California, Marin County and the City of Sausalito, itself.

9.      Jurisdiction exists based on 28 U.S.C. Section 1331 and 1343 in that this case is brought pursuant to 42 U.S.C. Section 1983 and raises questions of federal constitutional law under the Eighth, Fourth and Fourteenth Amendments. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. Sections 2201(a) and 2202.

**INTRADISTRICT ASSIGNMENT**

10.      Because this action arises in Marin County, it is assigned to the San Jose Division. Venue is proper in the Northern District in that the events and conduct complained of in this action are occurring in the Northern District.

**PARTIES**

11.      Plaintiff **CALIFORNIA HOMELESS UNION (SAUSALITO LOCAL 19121)** ("Homeless Union" or "the Union") is an unincorporated association of homeless and housing-insecure families, individuals and advocates affiliated with the National Union of the Homeless. The Union's mission is to organize, represent and serve the homeless community in Sausalito and Marin County generally. The majority of its officers and members live in homeless encampments, vehicles, weekly-rate motels, shelters or doubled-up with other families. Due to the policy and practice of "sweeping" the homeless, clearing homeless encampments and passing laws that intended to or have the effect of dispersing the unhoused into more remote and dangerous areas,

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

1    Defendants, and each of them, continue to directly interfere with the Union's survival and

2    representational programs which have substantially increased during the COVID-19 pandemic. The

3    Union brings this suit on behalf of itself and on behalf of its members and other homeless residents

4    of the Dunphy Park encampment as well as the broader unhoused community of the City of

5    Sausalito.

6        12.    Plaintiff **Robbie Powelson** is a 25-year-old homeless resident of Dunphy Park and

7    President of the local Homeless Union who will be at increased risk of exposure to COVID-19 if he

8    is forced to leave as described in detail in his Declaration in Support of Plaintiffs' application.

9

10       13.    Plaintiff **Sharie McGregor** is a 64-year-old female with severe disabilities,

11   including chronic arthritis and asthma. If she is forced out of the Dunphy Park where she lives and

12   cooks food in the community kitchen, she will be unable to break camp every morning, carry her

13   possessions during the day, and set up her camp at nightfall. At her age and with underlying medical

14   conditions, she fears that she may be placed at increased risk of infection from COVID-19.

15

16       14.    Plaintiff **Michael Arnold**, 48, is a disabled United States military veteran currently

17   on disability and receiving treatment from the Veterans Administration. He became homeless and

18   went to Dunphy Park after the boat he was living on was destroyed. If he is forced to leave the Park

19   he is concerned that he will face increased risk of exposure to COVID-19.

20       15.    Plaintiff **Arnold Bruce** is currently living on his boat but fears that it may be seized

21   and destroyed by the authorities, as has happened to dozens of modest boats, and he will become

22   homeless. He is currently dependent on the Dunphy Park encampment for food and other

23
     necessities. If the encampment is cleared, it will cut him off from these necessities and force him to
24
     search in town for food and fresh water, meaning he may have to leave his boat "unattended," the
25

26   justification used by authorities to destroy boats belonging to the poorest members of the

27   community. If that happens, he will become actually homeless and placed at risk for increased

28   exposure to COVID-19.

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

16.    Plaintiffs **Arthur Bruce, Melanie Muasou, Sunny Jean Yow, Naomi Montemayor, Arthur Bruce, Mike North** and **Jackie Cutler** are all residents of the Dunphy Park encampment or dependent upon the encampment for vital necessities and are either members of or represented by Plaintiff California Homeless Union. They all fear that if the camp is cleared, they will face increased risk of exposure to COVID-19.

**Defendants**

17.    Defendant **City of Sausalito** is a municipal corporation within Marin County, existing under the laws of the State of California with capacity to sue and be sued.

18.    Defendant **Jill James Hoffman** is the Mayor of Sausalito who introduced into City Council and signed Resolution 6008 after it was passed by a vote of four to one.

19.    Defendant **Marcia Raines** is the City Manager of the City of Sausalito.

20.    Defendant **Kent Basso** is Superintendent of the Department of Public Works (DPW) charged by the City Council with overall authority to implement Resolution 6008 through his own department and other City Departments.

21.    Defendant **John Rohrbacher** is the Chief of Police for the City of Sausalito who heads one of the departments that the DPW is authorized to utilize to implement Resolution 6008.

22.    Defendants, and each of them, are sued both in their official and individual capacities.

## LEGAL STANDARD

23.    Pursuant to Local Rule 65.1(a), plaintiffs respectfully move for a temporary restraining order against Defendants and each of them. to halt the expulsion of homeless persons from Dunbar Park where approximately 20 homeless persons have been camped for almost two months. Specifically, Plaintiffs seek a Temporary Restraining Order and Preliminary Injunction against enforcement of City Resolution which authorized the City to remove homeless persons from Dunphy Par and banned homeless encampments anywhere in Sausalito with the exception of a

small area in Marinship Park where residents would be only allowed overnight and required to break camp "at sunrise." This will vastly increase risk of harm by way of exposure to and community spread of the coronavirus.

24.     A TRO is necessary to prevent irreparable harm to homeless plaintiffs prior to this Court having an opportunity to make a decision on Plaintiffs' motion for a preliminary injunction.

## MEMORANDUM OF POINTS AND AUTHORITIES

25.     In deciding an application for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, courts in the Ninth Circuit look to the following factors: a) The movant has shown a likelihood of success on the merits; b) There is a likelihood that the movant will suffer irreparable harm in absence of a preliminary injunction; c) The balance of equities tips in the movant's favor; d) The injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009). Also see Idaho v. Coeur d'Alene Tribe, 794 F.3d 1039, 1046 (9th Cir. 2015) quoting from Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1124 (9th Cir.2014)).

**In the Ninth Circuit, Under *Alliance for the Wild Rockies v. Cottrell*, Likelihood of Success is Shown if Plaintiffs Raise "Serious Questions" Going to the Merits and the Balance of Hardships Tips SharplyTowards Plaintiffs.**

26.     To determine whether to issue a TRO, the courts in the Ninth Circuit apply the same analysis used to evaluate a motion for preliminary injunction. *McCarthy v. Servis One, Inc.*, 2017 U.S. Dist. LEXIS 32622, at *9–10 (N.D. Cal. Mar. 7, 2017). The Ninth Circuit has adopted a "sliding scale" to approach such that a plaintiff need only show that there are *"serious questions going to the merits*, such that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff can show that there is the likelihood of irreparable —a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips

sharply in the plaintiff's favor and the other two factors are satisfied. *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

27.     Here, Plaintiffs' Complaint and Application for a TRO raises serious questions including the legality, under the Federal and State Constitutional rights as well as state and local public health orders, of Defendants' plan to expel the homeless from Dunphy Park when it is undisputed that the shelters are full and COVID-19 infections and fatalities continue. (See Powelson Declartion.) As the Centers for Disease Control (CDC) expressly warns, "If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are. ***Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread.***" (Exhibit D, Emphasis added.)

### State-Created Danger

28.     In addition, serious questions arise regarding state-created danger by way of affirmatively increasing the risk of harm and even death faced routinely by homeless persons deprived of the relative safety of the encampment community and the material support rendered by charitable organizations and ordinary citizens. While there may be no fundamental right to housing, the Ninth Circuit recognizes liability under substantive due process where a state or local official acts to place a person in a situation of known danger with deliberate indifference to their personal or physical safety. *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006) " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Com'rs of Bryan County, Okl v. Brown*, 520 U.S. 397. "In examining whether [the city] affirmatively places an individual in danger, [a court does not look solely to the agency of the individual, nor [does it rest its] opinion on what options may or may not have been available to the individual. Instead, [the court must] examine whether [the city] left the person in a situation that was more dangerous than the one in which they

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

found him." *Kennedy*, 439 F.3d at 1062 (citations omitted) See also, Northern District Magistrate

Judge Susan van Keulen's Order of January 20, 2021 granting plaintiffs' Ex Parte Application for

Preliminary Injunction in the ongoing case of *Santa Cruz Homeless Union, et al v. [Santa Cruz City*

*Manager] Martin Bernal, City of Santa Cruz, et al,* Case No. 20-cv-09425-SVK, attached hereto as

Exhibit E.

29.     Here, where it is undisputed that there are no shelters or individual housing options

available; where the "option" provided to the Dunphy Park residents of relocation to Marinship

Park where they will be exposed to clouds of lead-based paint dust and fiberglass resulting from the

daily boat crushing operations immediately adjacent to the Park and, in any case to break camp at

dawn, wander the streets till dusk and then return to Marinship Park to re-establish the camp,

including re-assembling the community kitchen, Defendants act in flagrant disregard of CDC

guidelines and both state and county COVID-related public health orders. (See, Declarations of

Robbie Powelson, Sherie Lynn McGregor, Arthur Bruce and Michael Arnold.)

30.     Plaintiffs have shown the existence of "questions *serious enough to require*

*litigation*. *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009) (Emphasis added.)

### The Harm to Plaintiffs is Both Irreparable and Imminent

31.     To support injunctive relief, harm must not only be irreparable, it must be imminent;

a threat of irreparable harm in the indefinite future is not enough. Rather, a plaintiff must

demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. *Amylin*

*Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011).

32.     To demonstrate immediate threatened injury as a prerequisite to preliminary

injunctive relief, a plaintiff must proffer probative evidence that the threatened injury is imminent

and irreparable. *Rubin ex rel. NLRB v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1100-

01 (C.D. Cal. 2015). Here, the undisputed evidence that the threatened injury is imminent is shown

by the decision announced by Defendants on February 5, 2021 -- and now already underway --to

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

clear plaintiffs from Dunphy Park in utter regard of Federal, State and Marin County COVID-19 guidelines and orders regarding the clearing of homeless encampments.

33.     Here, that the threatened injury is irreparable can hardly be disputed. There is no cure for COVID-19 which, it is now established, can lead not only to serious illness and death, but to permanent disabilities including loss of vital senses as well as increased vulnerability to underlying conditions and new disabilities such as heart disease. (Exhibit D). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Inland Steel Co. v. United States*, 306 U.S. 153, 156 (1939); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940). In *Winter v. Natural Resources Defense Council, Inc*. 555 U.S. 7 the Court reiterated the general standard and held that a "mere possibility" of irreparable harm is insufficient to warrant a preliminary injunction. Here, the threatened injury is hardly speculative and far more than a "mere possibility" given the emergence of new, more contagious variants, low numbers of fully vaccinated residents of California, including Sausalito and Marin County and the other risks identified in the October 27, 2020 Marin County "Risk Reduction Order" which is still in effect despite the recent lifting of the statewide "shelter-in-place" order and which expressly provides for continued limitations on leaving the home for anything but essential activities.  Accordingly, Plaintiffs have met the "irreparable harm" element of the test for preliminary injunction.

### The Balance of Interim Harms Tips Heavily in Plaintiffs' Favor

34.     The court must evaluate the interim harm the defendants are likely to sustain if the injunction is granted and compare it with the harm the plaintiff is likely to suffer if an injunction does not enter. *De Vico v. United States Bank*, 2012 U.S. Dist. LEXIS 155622, at *22 (C.D. Cal. Oct. 29, 2012).

35.     The real issue is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). If a plaintiff can only show that there are serious questions going to

the merits—a lesser showing than likelihood of success on the merits—then a preliminary

injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor and the

other two *Winter* factors are satisfied. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291

(9th Cir. 2013)

Page - 12

36.     Here, beyond sweeping, vague and undocumented presentations by the City Attorney

and Defendant Police Chief Rohrbacher at the February 5, 2021 meeting of the Sausalito City

Council there were no specific public health and safety issues identified and at least Chief

Rohrbacher's Slide Presentation contained very few, if any, references to COVID -19. (See, Exhibit

A to the declaration of Robbie Powelson). Indeed, to the extent that any genuine threat to the health

and safety of persons encamped at the Park or to the public at large exist, they are a product of the

City's own failure to provide even minimal services, hygiene facilities and routine maintenance. In

addition, the City has failed to provide any COVID-19 related education, assistance or support to

the camp, although such activities are expressly provided in CDC guidelines for homeless

encampments, the links to which are provided by the City itself at its own website. See, Declaration

of Robbie Powelson.

37.     But even accepting the proffered justifications as true—which Plaintiffs do not--

every one of these conditions could be remedied without forcing the homeless out -- in defiance of

federal, state and county health orders and guidelines -- into the toxic conditions at Marinship Park

and the daily and dangerous compelled nomadic existence, who must carry what little they own on

their backs like so many pack animals or make repeated returns to Marinship Park to retrieve

needed items, in any case, unnecessarily pushed from dawn til dusk into the streets, while the

pandemic is far from over, the vast majority have not been fully vaccinated against COVID-19 and

scientists report that California is now seeing new, more contagious variants of the coronavirus. The

"hardships" that Defendant's might point to in opposing Plaintiffs' application are largely self-

created and, in any case, pale by comparison with those faced by those evicted from the encampments with nowhere to go.

**The Injunction Is In The Public Interest Because, as the CDC Warns, Clearing Homeless Encampments Increases the Potential for Infectious Disease Spread**

38.     The public interest analysis for the issuance of a preliminary injunction requires the Court to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief. *Collins v. Brewer*, 727 F. Supp. 2d 797, 814 (D. Ariz. 2010).

39.     Here, *there is no public interest that would be injured by the grant of an injunction.* On the contrary: it is in the interests of the general public that it be protected from community spread of the coronavirus, a consequence of clearing homeless encampments expressly identified by the CDC as discussed above. (Exhibit D) In short, Plaintiffs have satisfied their burden for the issuance of a TRO and Preliminary Injunction and pray this Court will grant Plaintiff's Application.

## <u>FIRST CLAIM FOR RELIEF</u>

State-Created Danger in Violation of Due Process Guarantee Under the U.S. Constitution
U.S. Const., Amend. XIV; 42 U.S.C. § 1983

40.     Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

41.     Under the 14th Amendment to the U.S. Constitution, no state can "deprive any person of life, liberty or property without due process of law." This federal constitutional provision confers upon Plaintiffs a right to be free from a deprivation of their due process rights by Defendants.

42.     Under 42 U.S.C. Section 1983, "[e]very person who, under color of any statute, regulation custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party inured in an action at law…"

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

43.     As part of this right, Defendants are prohibited from affirmatively placing Plaintiffs in known or obvious danger of increased risk of exposure to COVID-19 and separation from vital services constituting a threat to Plaintiffs' right to bodily integrity.

44.     Accordingly, Defendants have subjected Plaintiffs to state-created danger in violation of the 14th Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

**SECOND CLAIM FOR RELIEF**

State-Created Danger in Violation of Due Process Guarantees Under the California Constitution
Cal.Const. Ar. I §7

45.     Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

46.     Under Article I, Section 7 of the California Constitution "A persons may not be deprived of life, liberty or property without due process of law." This state constitutional provision confers upon Plaintiffs a right to be free from a deprivation of due process rights by Defendants.

47.     As part of this right, Defendants are prohibited from affirmatively placing Plaintiffs in known or obvious danger under an objective deliberate indifference standard.

48.     By clearing the homeless encampments in San Lorenzo Park and the Benchlands and failing to provide alternative safe housing, where those acts have made Plaintiffs and other similarly situated unhoused persons at greater risk of COVID-19 infection, injury and death, Defendants have affirmatively placed and continue to place Plaintiffs in known or obvious danger.

**JURY DEMANDED**

49.     Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein:

50.     Plaintiffs respectfully request that this Court order the following:

(a) Grant a Temporary Restraining Order, Preliminary Injunction or Permanent Injunction immediately enjoining Defendants and each of them from evicting plaintiffs from Dunbar Park.

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

(b) Order Defendants to immediately suspend enforcement of Resolution 6008 pending disposition of this matter by this Court and permit homeless persons who may have already been displaced from Dunphy Park to return to this location.

(a) Order Defendants and each of them to strictly observe COVID-19 guidelines regarding clearing of homeless encampments.

(b) That the Court retain jurisdiction and exercise oversight as to Defendants' compliance with its Orders.

(c) That the Court award reasonable attorney's fees to Plaintiffs' counsel

(d) Any further relief this Court deems appropriate.

Dated: February 16, 2021                                    Respectfully Submitted,

                                                            /s/ Anthony D. Prince

                                                            Anthony D. Prince,
                                                            General Counsel, California Homeless Union

## VERIFICATION

I, Robbie Powelson, in my official capacity as President of the Sausalito/Marin County Homeless Union, an affiliate of the California Homeless Union, lead Plaintiff in the above-captioned action, declare the following: The facts alleged in this Complaint and *Ex Parte* Application for a Temporary Restraining Order -- including the fact that individual plaintiffs are members of or represented by the Union--are true of my own knowledge, except those statements made upon information and belief and, as to such statements, I believe them to be true.

Sworn under penalty of perjury under the laws of the United States of America

Dated: February 16, 2021

At Sausalito, California                                    /s/ Robbie Powelson

*Ex Parte* Application for TRO/Preliminary Injunction; Complaint for Violation of Civil Rights

# Exhibit A

# NOTICE TO VACATE
## UNAUTHORIZED ENCAMPMENT

**DATE and TIME OF POSTING:** Tuesday, February 9, 2021, at 5:3█ p.m.

**LOCATION:** Dunphy Park (between 1498 Bridgeway and 300 N█pa St.)

The unauthorized use of Dunphy Park for camping purposes and the storage of personal property thereon has been determined to pose serious health, welfare and safety risks to the persons living in the encampment and to the environment that adversely affect residential and commercial uses due to the location's proximity to Richardson Bay, and lack of access to restrooms, showers and other sanitary services.

PURSUANT TO ITS AUTHORITY UNDER SAUSALITO MUNICIPAL CODE SECTION 13.28.010, THE CITY HAS MANDATED THE CLOSURE OF ALL CITY-OWNED AND CITY-CONTROLLED PROPERTY TO OVERNIGHT CAMPING, EXCEPT THE DESIGNATED AND SIGNPOSTED AREA WITHIN MARINSHIP PARK (AT TESTA STREET AT MARINSHIP WAY) AS A TEMPORARY, TRANSITIONAL OVERNIGHT CAMPING LOCATION FOR INDIVIDUALS WHO HAVE NO OPTION OF SLEEPING INDOORS.

THE PUBLIC WORKS DEPARTMENT WILL CLEAR AND CLOSE THIS SITE AT APPROXIMATELY 9 a.m. ON TUESDAY, FEBRUARY █, 2021, CONDITIONED ON THE AVAILABILITY OF STORAGE AT MARINSHIP PARK. ALL PERSONS ARE DIRECTED TO VACATE THIS SITE AND REMOVE ANY PERSONAL BELONGINGS.

Property left at the time of cleanup will be removed from the site and stored by the City and can be retrieved by contacting 415-289-█70. Property that is unsafe or hazardous will be immediately discarded.

IF YOU HAVE ANY QUESTIONS OR CONCERNS PLEASE CONTACT

LIEUTENANT STA█ GREGORY AT 415-289-4170

-1-

# Exhibit B

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

## RESOLUTION NO. 6008

## RESOLUTION OF THE SAUSALITO CITY COUNCIL AFFIRMING ITS COMMITMENT TO WORK WITH OUR REGIONAL AND LOCAL PARTNERS TO EXPLORE EVERY OPPORTUNITY TO PROVIDE SHELTER AND CARE TO THOSE WITHOUT A HOME AND TO TREAT ALL INDIVIDUALS EXPERIENCING HOMELESSNESS WITH COMPASSION AND DIGNITY

**WHEREAS**, as of January 2019, California had an estimated 151,278 people experiencing homelessness on any given day, as reported by Continuums of Care to the U.S. Department of Housing and Urban Development (HUD); and

**WHEREAS,** of that total, 7,044 were family households, 10,980 were Veterans, 11,993 were unaccompanied young adults (aged 18-24), and 41,557 were individuals experiencing chronic homelessness; and

**WHEREAS,** the City of Sausalito has shown its commitment to reducing homelessness and providing housing opportunities for all segments of the community in the following goals, policies and programs in the City of Sausalito 2015-2023 Housing Element adopted January 13, 2015:

-Goal 5.0 **Promoting equal housing opportunities**:   "Promote equal housing opportunities for all residents, including Sausalito's special needs populations, so that residents can reside in the housing of their choice"; and

-Policy 5.6 **Homeless Housing and Services**: "Work cooperatively with Marin County and other applicable agencies to provide a continuum of care for the homeless, including emergency shelter, transitional housing, supportive housing and permanent affordable housing"; and

-Program 27 **Homeless Continuum of Care**:

"Support Countywide programs and the Marin Continuum of Care in the provision of resources to address the needs of the homeless and persons at risk of homelessness, including emergency shelter, transitional housing, supportive housing and permanent housing. Continue to provide flyers and information on the City's website about the emergency 211 toll-free call system for information and referral"

Senate Bill 2 establishes requirements for emergency shelter ordinances. During the State HCDs review of Sausalito's draft 2015-2023 Housing Element, the State requested specific changes to the City's Emergency Shelter Ordinance that was adopted in July 2014. To address this issue, the City will amend Section 10.28.080 of the Municipal Code as follows: a) amend Sausalito Municipal Code Section 10.28.080.I.3 (Management Plan) to remove the words "for approval" in the sentence "Prior to commencing operation, the shelter operator shall provide a written management plan to the Director for approval" and add the words "(to the extent such services are

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

required)" after the phrase "The management plan shall address"; and b) eliminate Sausalito Municipal Code Section 10.28.080.I.4 (Annual Report).

**2015-2023 Objectives**: Support implementation of the Homeless Countywide Continuum of Care and continue to publicize the emergency 211 call system. In 2015, amend Sausalito Municipal Code Section 10.28.080.I.3 and Sausalito Municipal Code Section 10.28.080.I.4 as specified in Program 27."

**WHEREAS,** in 2016, the City Council adopted Ordinance Nos. 1235 and 1237 thereby making the modifications to the City's Emergency Shelter Ordinance and implemented Program 27 of the Housing Element; and

**WHEREAS**, the draft General Plan Update currently being considered by the Council includes Policy HS-5.3 "Provide for Compassion. Support organizations and service providers that provide aid and social support in Sausalito. Services that provide housing, transportation, healthcare, and other social services to vulnerable individuals and communities are an essential part of the greater Sausalito community;" and

**WHEREAS**, the City of Sausalito has been working with our regional and local representatives, the County of Marin, Marin County Health and Human Services, the Marin County Office of Veterans Services, local and regional non-profit organizations, and the faith-based community to provide needed services and find viable alternative shelter for the individuals in the Dunphy Park encampment; and

**WHEREAS,** since 2017, the City of Sausalito, in conjunction with the Richardson's Bay Regional Agency (RBRA), and the County of Marin, has participated in various efforts to preserve Richardson's Bay waters and assist anchor-outs and other vulnerable populations, including annual Richardson's Bay debris collection events , participation in the mobile showers offered by the Downtown Streets Team, and provision of grab-and-go bags of groceries from the San Francisco-Marin Food Bank during Mobile Shower visits during the pandemic; and

**WHEREAS,** in order to address vessels in Sausalito waters the City also developed the Safe Harbor Program – a partnership with the local marinas in Sausalito to find slips for sea worthy vessels that allow the boat's occupants a safe, secure place to dock and ready access to numerous benefits including transportation, sanitary facilities and employment; and

**WHEREAS**, the Sausalito Police Department has hosted an annual Homeless Outreach Event in November for Sausalito's anchor-out and homeless communities providing attendees with access to free medical and dental care, clothing, and supplies.

## NOW, THEREFORE, THE CITY COUNCIL HEREBY RESOLVES:

The City Council affirms its commitment to continue to work with its regional and local partners to explore every opportunity to provide shelter and care to those without a home and to treat all individuals experiencing homelessness with compassion and dignity.

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

**RESOLUTION PASSED AND ADOPTED**, at the regular meeting of the City Council on the 5th day of February 2021, by the following vote:

| AYES: | Councilmember: | Sobieski, Cleveland-Knowles, Kellman, Mayor Hoffman |
| NOES: | Councilmember: | Blaustein |
| ABSENT: | Councilmember: | None |
| ABSTAIN: | Councilmember: | None |

DocuSigned by:

Jill James Hoffman

234F94F8675F49A...

JILL JAMES HOFFMAN
MAYOR

ATTEST:

DocuSigned by:

Heidi Scoble

619A8B140986467...

HEIDI SCOBLE
CITY CLERK

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

## RESOLUTION OF THE SAUSALITO CITY COUNCIL
## CLOSING CERTAIN CITY PROPERTY AND PARKS TO OVERNIGHT SLEEPING

### EXHIBIT A: STANDARD OPERATING PROCEDURE

### CLEANING AND CLEARING OF HOMELESS ENCAMPMENTS AND IMPOUNDMENT OF PROPERTY

I.   **General Provisions**

A.   These Standard Operating Procedures govern the cleaning and clearing of homeless encampments on City property and the impoundment of personal property unlawfully stored or maintained on public property.

B.   All departments and employees of the City of Sausalito must comply with these Standard Operating Procedures.

C.   The Department of Public Works (DPW) shall have primary responsibility for implementing these Standard Operating Procedures, and may enlist support from other City departments as needed.

D.   Notwithstanding the Municipal Code or other applicable law, the City shall not cite or arrest any individual solely for overnight sleeping or camping on public property, or otherwise for the status of being homeless.

E.   The City must balance the rights of encamped individuals against its fundamental duty to maintain public health, welfare, and safety.

F.   As used in these Standard Operating Procedures, the following terms shall have the meanings given them in this section.

1.   "Camp" or "camping" means using property for living accommodation purposes, as evidenced by: (a) remaining for prolonged or repetitious periods of time, not associated with ordinary recreational use of the property as authorized under any other ordinance or law, or regulation, with one's personal possessions or belongings (including, but not limited to, clothing, tents, sleeping bags, bedrolls, blankets, sheets, luggage, backpacks, kitchen utensils, cookware and cooking equipment); and (b) engaging in one or more of the following: sleeping, storing personal possessions or belongings, making a fire outside of a designated fire pit, or cooking meals.

2.   "Camping facilities" means and includes, but is not limited to, tents, huts, temporary shelters, unpermitted structures and, when used for the purpose of sleeping, vehicles.

3.   "Personal property" means any and all tangible property, and includes, but is not limited to, items, goods, materials, camping facilities, merchandise, furniture and cooking equipment.

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

II.     **Public Noticing**

A.      Where the City authorizes overnight camping at a location but requires that persons camping overnight remove their camping facilities and personal property from that location during daytime hours, the City must provide reasonable notice of these requirements.

1.      The notice must be in writing, distributed to those encamped, and posted around the encampment. As feasible, the notice must also be given orally to those encamped. The notice must include a description of any and all conditions imposed on overnight camping at that location, including any requirements for campers to depart and remove their camping facilities and personal property from the overnight camping location during any specified hours.

2.      In the event a person camping overnight fails to comply with legal requirements to remove their camping facilities and personal property from the overnight camping location during daytime hours, the City shall post notice of non-compliance in writing in a visible manner on or in the immediate vicinity of the offending camping facilities or personal property. As feasible, notice of non-compliance must also be given orally to the person in non-compliance. The notice must also inform the overnight camper that a second violation of the daily requirement to remove their camping facilities and personal property from the overnight camping location during daytime hours may result in the City's impoundment of their camping facilities and/or personal property unlawfully remaining at the overnight camping location.

B.      Except as provided in Section II.A., before conducting any non-urgent cleaning, clearing or impoundment activities, the City must provide at least 72-hours' notice.

1.      The notice must be provided in writing, distributed to those encamped, and posted around the encampment. As feasible, the notice must also be given orally to those encamped.

2.      The notice must include a description of the activities to be conducted, the approximate date and time of those activities, any temporary or permanent relocation requirements, information about authorized overnight camping locations, offers of indoor shelter or alternative housing and information about recovery of personal property.

C.      Before conducting any emergency cleaning, clearing or impoundment activities, the City must make reasonable efforts to provide some form of notice, that may include outreach workers visiting the site and sharing information orally or in writing.

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

1. Emergency activities are warranted where conditions present a serious threat of environmental harm or injury or death to any persons, including but not limited to wildfire, severe weather, flooding, tsunami, earthquake, and infectious disease.

III. **Cleaning of Encampments and Surrounding Public Property**

A. After providing the notice described in Section II, the City may conduct any cleaning or maintenance activities within an encampment that it deems to be in the interest of the public health, welfare, or safety. These cleaning activities may include but are not limited to:

 1. Removing debris, trash, waste, illegal dumping, hazardous materials, or other materials; and

 2. Washing and sanitizing the encampment area.

B. The City may require campers to temporarily or permanently relocate during cleaning activities when it finds that this is necessary to protect public health, welfare, or safety.

C. Notwithstanding Sections II and III.A, the City may conduct routine cleaning and maintenance activities on public property in the vicinity and around an encampment without providing advance written notice. These activities may include, but are not limited to:

 1. Cleaning, servicing, and repairing restrooms, showers, parks and recreation facilities, and other public facilities;

 2. Performing routine waste, recycling, compost, and trash collection;

 3. Conducting ordinary maintenance and landscaping activities, such as street sweeping, sidewalk cleaning, raking, blowing, mowing, tree trimming, and hedging.

IV. **Clearing and Closing Encampments**

A. After providing the notice described in Section II, the City may clear and close any encampment or any portion of an encampment, provided that:

 1. The City has located and offered indoor shelter or alternative housing to each affected homeless person; *or*

 2. The closure is for a temporary period of eight hours or less; *or*

 3. The City has designated an alternative location within the City for overnight sleeping and camping by homeless persons who have no option to sleep indoors.

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

B. The City must document in writing any decline of an offer of indoor shelter or alternative housing prior to clearing and closing an encampment.

C. The City may coordinate clearing and closing of encampments with other relevant public agencies, as appropriate.

V.   **Storage and Recovery of Property**

A. The City will take reasonable efforts to mitigate property loss during cleaning and clearing activities or impoundment of property unlawfully stored or maintained on public property, and to ensure that campers have a reasonable opportunity to recover property collected by the City during such activities.

B. During the notice period, before cleaning and clearing or impoundment activities begin, the City will not prevent campers from retrieving their belongs.

C. After the notice period, and after cleaning, clearing or impoundment activities have begun, the City will allow campers to retrieve their belongings as long as they do so in a reasonable period of time and do not interfere with the safety of operations.

D. During cleaning, clearing and impoundment activities, the City will dispose of the following materials and not store them for later recovery:

   1. Items that are soiled (i.e., mildewed; moldy; stained with or contaminated with urine, bodily waste, or other waste matter) (e.g., mattresses, blankets, sleeping bags, etc. that are soiled as described);

   2. Items that are perishable (e.g., perishable food, open personal products);

   3. Items that are contaminated (e.g., used for hygiene, such as toothbrushes, hairbrushes, wash cloths, underwear);

   4. Items that are hazardous, combustible, or present a fire risk (e.g., car batteries, gasoline cans, propane tanks, generators);

   5. Items that are broken or disassembled (e.g., electronics stripped for copper, flat tires, disassembled or broken furniture, disassembled or broken bikes or cars, rags);

   6. Weapons (all weapons will be turned over to the Police Department);

   7. Paper products;

   8. Open household products;

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

9.  Items that are considered to be trash; and

10. Items that are considered to be unsafe for storage.

E.  For other property, including the items listed below, the City will make reasonable efforts to store up to one square yard of property per individual, tent, or living space. This will include property whose ownership cannot be determined, or property whose ownership is known but whose owner cannot transport the property.

1.  Identification (e.g., passport, Social Security card, Driver's License, library card);

2.  Medications (controlled substances must be turned over to the Police Department);

3.  Photographs, photo albums, and other items of obvious sentimental, religious, or personal value (e.g., religious icons, holy books);

4.  Tax records;

5.  Medical records;

6.  Other vital records (e.g., bank records, checkbooks);

7.  Unopened mail;

8.  Electronics in reasonable shape (i.e., not leaking);

9.  Tools;

10. A functional bicycle;

11. Books; and

12. Up to the volume of a 64-gallon bag of miscellaneous items that its owner attests does not contain any items listed in section V.D above.

F.  "Reasonable efforts" must comport with ordinary practices with respect to property storage.

G.  DPW will, before the end of the cleaning, clearing or impoundment activities, post a "Notice of Collected Property" at the site, which will contain a call center telephone number to facilitate property retrieval.

H.  Storage of above listed will only occur if such storage is safe based on current public health guidance.

DocuSign Envelope ID: 4C833937-70D1-4898-9EAF-21E77AAD9D61

I.      DPW will use its ordinary form(s) or methods to record a general description of the item(s) and the date of and location from which they were removed.

J.      DPW will store them for at least ninety (90) days, and longer if such storage is feasible based on storage capacity and/or resources.

K.      DPW may use its discretion to leave rather than store any item listed here if storage would harm the item's owner or harm staff responsible for the storage

L.      If additional procedures are required, they may be promulgated by DPW.

VI.   **Compliance**

A.      The City cannot require any person to accept any offered form of indoor shelter or alternative housing, even if acceptance is strongly recommended for public health or public safety reasons.

B.      The City will continue outreach efforts and service offers regardless of encampment compliance. Outreach workers may assist encampment residents to achieve voluntary compliance

C.      Notwithstanding the Municipal Code or applicable law, the City shall not cite or arrest any individual solely for overnight sleeping or camping on public property, or otherwise for the status of being homeless.

D.      The City, its officers, employees, and agents shall not be liable to the owner of impounded personal property because of any transport, handling, storage or disposal of the property made pursuant to these procedures. Additionally, the owner of impounded personal property shall bear the responsibility for the risk of any loss or damage to the impounded property.

# Exhibit C

⚠ **COVID-19 Status Update for 02/14/2021**

✕

Marin County COVID-19 Status Update for February 14 includes updated COVID-19 data. Para leer esta página en español, desplácese hacia arriba y haga clic en el enlace que dice "Translate" (Traducir) y elija "Spanish" (... Read More

Translate

Home / Stay home order effect marin county

# Health Orders in effect for Marin County

# Stay Home Order

## UPDATE: The State's Regional Stay Home Order has been lifted!

As of 9:00am on Monday, January 25, the State of California lifted the regional stay-home order for Marin and all counties in California.  The County's "Risk Reduction Order" (below) will resume immediately.

# Risk Reduction Order

## *YOU can help Marin County stay healthy and end COVID-19*

On October 27, Marin Public Health replaced the previous "Shelter In Place" order with a countywide "Risk Reduction" Order.  The new and updated order acknowledges Marin County's progress through the State of California's Blueprint for a Safer Economy and better aligns with the State of California's current health orders and guidance to protect ourselves, our households and our community.  It also acknowledges the personal responsibility of individuals and business owners/operators in limiting the spread of COVID-19.

One thing that has not changed is the need to practice caution in deciding when to leave our homes and for what purpose. The virus is still present in our community, and even people without symptoms can have COVID-19 and give it to others. It's important to help protect the people we live, work, and interact with so they don't get the virus. For adults over 65 and people with certain health conditions, being exposed to COVID-19 could be deadly. **We must all continue to practice social distancing, wear facial coverings, and wash our hands frequently.**

To help you understand the restrictions of the order, please review the resources provided below:

**Information about the Risk Reduction Order**

- Read the Full Risk Reduction Order
  - Appendix A – Site Specific Protection Plan for Re-opening Businesses Fillable PDF: (English) (Spanish) (Vietnamese)
  - Appendix B-1 – Small Construction Project Safety Protocol
  - Appendix B-2 – Large Construction Project Safety Protocol
  - Appendix C-1 – Additional businesses permitted to operate (**updated January 25, 2021**)
  - Appendix C-2 – Allowed additional activities (**updated October 27**)

**Business Guidelines For Operating Under the Risk Reduction Order & Blueprint for a Safer Economy.**

MarinRecovers.com provides current operating status, reopening and recovery information for both businesses and residents. As operating status and reopening changes are announced for a specific business type, those materials will be posted at MarinRecovers.com. Below is a list of quick links to help you find information related to businesses allowed to reopen under current health orders.

* Business Guidelines for Reopening
* Marin Industry / Business Reopenings To Date

# Facial Covering (Mask) Requirement

## Current health orders mandate face masks be worn at all times when outside of the home, with few exceptions.

Currently, two public health orders **require** the use of masks or face coverings in Marin County:  (1) Marin County Public Health order of April 22, and (2) a Statewide mask order of November 16.

Everyone is asked to wear a face covering when they are interacting with others who are not members of their household in public and private spaces. Specifically, the order states that people must wear face coverings when:

* Inside public spaces or waiting in line to enter public spaces
* Getting health care
* Waiting for or riding on public transit or other shared transportation
* In common areas of buildings, such as hallways, stairways, elevators and parking facilities.
* At work, when near others or moving through common areas
* Outdoors, if you can't stay 6 feet away from others

Use of face coverings is not a substitute for practice physical distancing by staying 6 feet away from others, staying home as much as possible, and washing your hands frequently with soap and water for at least 20 seconds.

## Resources and Information About Masks & Face Coverings

* Face Coverings and Masks Information & Resource Page
* Marin Public Health Order requiring Face Coverings
* State of California Guidance for Masks & Face Coverings.

# What is the Legal Authority for the State and Local Orders Issued in Response to the Pandemic?

The State's Regional Stay at Home Order, issued December 3, 2020, lists the California Health and Safety Code provisions that authorize the California Department of Public Health to take action necessary to protect public health. (California Health & Safety Code Sections 120125, 120130(c), 120135, 120140, 120140, 120145, 120175, 120195 and 131080.)  Additional authority is provided by Governor Newsom's Executive Orders N-25-20 and N-60-20, which were issued pursuant to the Emergency Services Act, California Government Code Section 8550 et seq. Local Health Orders issued by the Marin County Health Officer are issued pursuant to California Health and Safety Code Sections 101040, 101085, and 120175.

**See all Public Health Orders**          **Frequently Asked Questions**

*This page provides an overview of some of the public health orders currently in place for Marin County. Please **see all public health orders** to review all current orders, including those focused on medical care, healthcare facility operations and other aspects of the COVID-19 response in Marin County.*



Accessibility

Disclaimers

Terms of Use

Notice of
Nondiscrimination

▶ YouTube

⚙ Facebook

🐦 Twitter

🏠 Nextdoor

Enter your email

**Subscribe**

Be the first to find out about updates and the latest news in Marin County.

COUNTY OF MARIN

© 2020 County of Marin. All rights reserved.

If you are a person with a disability and require an accommodation to participate in a County program, service, or activity, requests may be made by calling (415) 473-4381 (Voice), Dial 711 for CA Relay, or by **email** at least five business days in advance of the event. We will do our best to fulfill requests received with less than five business days' notice. Copies of documents are available in alternative formats upon request.

⚠ **COVID-19 Status Update for 02/13/2021**

×

Marin County COVID-19 Status Update for February 13 includes updated COVID-19 data. Para leer esta página en español, desplácese hacia arriba y haga clic en el enlace que dice "Translate" (Traducir) y elija "Spanish" (... **Read More**

Translate

Home / Risk reduction order

# Risk Reduction Order

### ORDER OF THE HEALTH OFFICER

### OF THE COUNTY OF MARIN ESTABLISHING

### MANDATORY RISK REDUCTION MEASURES APPLICABLE TO ALL ACTIVITIES AND SECTORS TO ADDRESS THE COVID-19 PANDEMIC

#### DATE OF ORDER: October 27, 2020

**Please read this Order carefully. Violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295, et seq.; Cal. Penal Code §§ 69, 148(a)(1).)**

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, THE HEALTH OFFICER OF THE COUNTY OF MARIN ("HEALTH OFFICER") ORDERS:

1. **Purpose and Intent.**

   a. This Order (hereinafter "Order" or "Risk-Reduction Order") rescinds and supersedes the May 15, 2020 Order of the Health Officer directing all individuals to shelter in place ("Prior Order"), as of the effective date and time set forth in Section 14 below. On August 28, 2020, the State of California issued the Blueprint for a Safer Economy, a new tiered system which classifies counties into tiers based on COVID-19 transmission rate and related metrics. Under the Blueprint system, the extent to which businesses and activities may operate is governed by the County's tier, as designated by the State. This Risk-Reduction Order incorporates the State's Blueprint framework, associated orders, and guidance. COVID-19 continues to pose a severe risk to residents of our County, and significant safety measures are necessary to protect against a surge in COVID-19 cases and deaths. This Order requires risk reduction measures to be in place across all business sectors and activities, ensuring necessary precautions are followed as we adapt the way we live and function in light of the ongoing threat that the virus poses. The Health Officer will continue to monitor data regarding and evolving scientific understanding of the risks posed by COVID-19 and may amend or rescind this Order based on analysis of that data and knowledge. As of the effective date of this Order set forth in Section 14 below, all individuals, businesses, and government agencies in the County are required to follow the provisions of this Order.

   b. The primary intent of this Order is to reduce the risk of COVID-19 transmission in the County. All provisions of this Order must be interpreted to effectuate this intent. Failure to comply with any of the provisions of this Order constitutes an imminent threat and menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both.

   c. The efforts taken beginning in March 2020 under the prior shelter-in-place orders of the Health Officer, along with those of health officers of five neighboring counties, slowed the virus's trajectory. While the public health emergency and threat to the County's population remain severe, the region has significantly increased its capacity to detect cases, contain spread, and treat infected patients through widespread testing; greatly expanded case investigation and contact tracing program and workforce; and expanded hospital resources and capacity. As we continue to evolve our strategies for protecting residents of the County from COVID-19, we must take into account both the trajectory of the virus in the County and across the region, and the

increased health risks associated with the opening of many Businesses and activities under the Prior Order. To protect the community from COVID-19, we must ensure that when people engage in activities they are doing so as safely as possible.

d.  The restrictions set forth in this Order are based on evidence of continued significant community transmission of COVID-19 within the County; scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically; evidence that the age, condition, and health of a significant portion of the population of the County places it at risk for serious health complications, including death, from COVID-19; and further evidence that others, including younger and otherwise healthy people, are also at risk for serious negative outcomes and can also spread COVID-19 to more vulnerable people. Because even people without symptoms can transmit the infection, and because evidence shows the infection is easily spread, direct or indirect interpersonal interactions can result in preventable transmission of the virus.

e.  The scientific evidence shows that, at this stage of the pandemic, it remains essential to maintain limitations and conditions to slow virus transmission to help: (a) protect the most vulnerable; (b) prevent the health care system from being overwhelmed; (c) prevent long-term chronic health conditions associated with COVID-19, such as cardiovascular, kidney, and respiratory damage and loss of limbs from blood clotting; and (d) prevent deaths. These limitations and conditions are necessary to slow the spread of the COVID-19 disease, preserving health care capacity in the County and advancing toward a point in the current public health emergency where transmission can be controlled.

2.  **Applicability.** All individuals, businesses, and other entities in the County are ordered to comply with the applicable provisions of this Order. For clarity, individuals who do not currently reside in the County must comply with all applicable requirements of the Order when they are in the County. Governmental entities are urged to follow the requirements of this Order applicable to businesses, but governmental entities and their contractors are not required to follow these requirements to the extent that such requirements would impede or interfere with an essential governmental function, as determined by the governmental entity, unless otherwise specifically directed by the Health Officer.

3.  **Incorporation of Emergency Proclamations and State Orders.**

    a.  This Risk Reduction Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Gavin Newsom; the March 3, 2020 Proclamation by the Assistant Director of Emergency Services Declaring the Existence of a Local Emergency in the County; the March 3, 2020 Declaration of Local Health Emergency Regarding Novel Coronavirus 2019 (COVID-19) issued by the Health Officer, and the March 10, 2020 Resolution of the Board of Supervisors of the County of Marin Ratifying and Extending the Proclamation of a Local Health Emergency.

    b.  This Order is also issued in light of the March 19, 2020 Order of the State Public Health Officer (the "State Shelter Order"), which set baseline statewide restrictions on non-residential business activities, effective until further notice; the Governor's March 19, 2020 Executive Order N-33-20 directing California residents to follow the State Shelter Order; the Governor's May 4, 2020 Executive Order N-60-20; the May 7, 2020 Order of the State Public Health Officer allowing local jurisdictions to begin phased reopening; the July 13, 2020 State Public Health Officer Order requiring the closure of certain businesses and sectors in certain counties, including the County, and the State's Blueprint for a Safer Economy issued on August 28, 2020. The May 4, 2020 Executive Order and May 7, 2020 Order of the State Public Health Officer expressly acknowledge that local health officers have authority to establish and implement public health measures within their respective jurisdictions that are more restrictive than those implemented by the State Public Health Officer.

4.  **Obligation to Follow Stricter Order.** Where a conflict exists between this Order and any order issued by the State Public Health Officer or the Governor related to the COVID-19 pandemic, the most restrictive provision controls. For clarity, all individuals and entities must comply with the State Shelter Order, any mandatory guidance issued by the California Department of Public Health, any mandatory orders of the Governor, or any other mandatory provision of State law to the extent it is stricter than any provision of this Order. Consistent with California Health and Safety Code section 131080 and the Health Officer Practice Guide for Communicable Disease Control in California, except where the State Health Officer may issue an order expressly directed at this Order and based on a finding that a provision of this Order constitutes a menace to public health, any more restrictive measures in this Order continue to apply and control in this County..

5.  **Obligation to Follow Health Officer Guidance and Mandatory State Guidance.** In addition to complying with all provisions of this Order, all individuals and entities, including all businesses and governmental entities, must also follow any applicable industry specific guidance issued by the County Health Officer, available at marinrecovers.com and attached Appendices, and any applicable "COVID-19 Industry Guidance" issued by the California Department of Public Health, available at https://covid19.ca.gov/industry-guidance/. To the extent that provisions in the guidance of the County Health Officer and the guidance of the State Health Officer conflict, the more restrictive provisions apply.

6.  **Definitions.**

    a.  For purposes of this Order, a "business" includes any for-profit, non-profit, or educational entity, whether a corporate entity, organization, partnership, or sole proprietorship, and regardless of the nature of the service, the function it

performs, or its corporate or entity structure. For clarity, "business" also includes a for-profit, nonprofit, or educational entity performing services or functions under contract with a governmental agency.

b. For purposes of this Order, "personnel" means the following individuals who provide goods or services or perform operations associated with a business in the County: employees; contractors and sub-contractors (such as those who sell goods or perform services onsite or who deliver goods for the business); independent contractors (such as "gig workers" who perform work via the business's application or other online interface); vendors who are permitted to sell goods onsite; volunteers; and other individuals who regularly provide services onsite at the request of the business.

7. **Staying Home Is the Best Way to Reduce Risk.** All people are strongly reminded that continuing to stay home as much as possible is the best way to prevent the risk of COVID-19 transmission, and therefore trips and activities outside the home should be minimized. All activities that involve contact with people outside of one's household increase the risk of transmission of COVID-19. Older adults (those age 65 or older) and individuals with serious underlying medical conditions (including immunocompromised state, chronic kidney disease, chronic obstructive pulmonary disease, obesity, serious heart conditions, sickle cell disease, and diabetes) are especially encouraged to minimize activities and interactions with people outside their household to the extent practicable.

8. **Social Distancing Requirements.** When in the presence of individuals from other households, including when outside of their household, all individuals should to the maximum extent possible adhere to "Social Distancing Requirements," except to provide necessary care to others (including childcare, adult or senior care, care to individuals with special needs, and patient care) or as otherwise expressly allowed in this Risk Reduction Order or State guidelines. Activities that cannot be conducted while maintaining Social Distancing Requirements may be conducted only in compliance with specific directives of the State or County Health Officer establishing the protocols that must be followed in order to reduce the risk of transmission of COVID-19 when conducting those specific activities. Social distancing requirements, unless otherwise indicated by State or County protocols or guidance, include the following:

   a. Maintaining at least six feet of social distance from individuals who are not part of their household;

   b. Frequently washing their hands with soap and water for at least 20 seconds, or using hand sanitizer that is recognized by the Centers for Disease Control and Prevention as effective in combatting COVID-19;

   c. Covering their coughs and sneezes with a tissue or fabric or, if not possible, into their sleeve or elbow (but not into hands);

   d. Wearing a face covering as required by the April 17, 2020 Order of the Health Officer Requiring Face Covering ("Face Covering Order") and the June 18, 2020 California Department of Public Health's mandatory Guidance for the Use of Face Coverings ("Face Covering Guidance") located at https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COV... ; and

   e. Avoiding all contact with anyone outside their household when sick with a fever, cough, or other COVID-19 symptoms.

9. **Face Coverings.** Face coverings must be worn at all times and by all individuals as specified in the Face Covering Order and Face Covering Guidance and in accordance with any additional directives issued by the State or County. Further, all individuals must wear face coverings at all times when inside a business facility or using public transportation. For clarity, a face covering is not required when a person is in a personal office (a single, fully enclosed room) when others outside of that person's household are not present as long as the public does not regularly visit the room; a personal office does not include a cubicle. Further, individuals under age two, individuals who have been advised by a healthcare professional that they should not wear a face covering because they have a medical condition that would make wearing a face covering dangerous, and individuals who are hearing impaired or communicating with someone who is hearing impaired, do not need to wear a face covering.

10. **Limitations on Gatherings.**

   a. Gatherings are defined as social situations that bring together people from different households at the same time in a single space or place. When people from different households mix, this increases the risk of transmission of COVID-19. For clarity, a gathering does not include normal operations in: classrooms; areas where people may be in transit; or settings in which people are in the same general space at the same time but engaged in separate activities, including, by way of example, medical offices, hospitals, or business environments like offices, stores, and restaurants where people may be working, shopping, or eating in the same general area but are not gathering together in an organized fashion. A gathering also does not include internal meetings exclusively involving personnel of a single business because those activities are subject to separate provisions of this Order and Health Officer guidance.

   b. Gatherings may occur only to the extent permitted and in strict compliance with the State Department of Public Health (CDPH) Guidance for Private Gatherings issued on October 9, 2020 located at: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Guidance-... and any subsequent guidance issued by CDPH or the Health Officer on private gatherings. Other gatherings not covered by State or local guidance or subsequent guidance are prohibited.

11. **Requirements Applicable to All Businesses.**

   a. Businesses Permitted to Reopen. All businesses permitted to operate in the County's designated Blueprint tier, as determined by the State, may operate. Marin County's tier status can be found at https://covid19.ca.gov/safer-economy/. All business operations are subject to the State's industry-specific guidance for reopening, available at

https://covid19.ca.gov/industry-guidance/, and subject to the requirements and limitations of this Order, unless otherwise prohibited by Appendix C.

b. Site-Specific Protection Plan. For the purposes of this Order, all businesses that are operating at facilities in the County visited or used by the public or personnel must, as a condition of such operation, prepare and post a "Site-Specific Protection Plan" for each of these facilities; provided, however, that construction activities shall instead comply with the Construction Project Safety Protocols set forth in Appendix B and not the Site-Specific Protection Plan. The Site-Specific Protection Plan must be substantially in the form attached to this Order as Appendix A. The Site-Specific Protection Plan must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and personnel. All businesses shall implement the Site-Specific Protection Plan and provide evidence of its implementation to any authority enforcing this Order upon demand.

c. Mandatory Reporting Regarding Personnel Contracting COVID-19. Businesses and governmental entities must require that all personnel immediately alert the business or governmental entity if they test positive for COVID-19 and were present in the workplace within the 48 hours prior to onset of symptoms or within 48 hours of the date on which they were tested. In the event that a business or governmental entity learns that any of its personnel is a confirmed positive case of COVID-19 and the employee was at the workplace within 14 days prior to the date of the employee's positive COVID-19 test, the business or governmental entity is required to report the positive case within four hours to the Public Health Department at 415-473-7191. Businesses and governmental entities must also comply with all case investigation and contact tracing measures by the County, including providing any information requested.

12. **Facilities that Must Remain Closed.** Unless a business, industry, or sector is permitted to open based on the County's tier designation in the State's Blueprint system, it must remain closed. The reopening status of businesses in Marin County can be found at https://covid19.ca.gov/safer-economy/.

13. **Enforcement.** Pursuant to Government Code sections 26602 and 41601, Health and Safety Code section 101029, and Marin County Code 7.99.01 et seq. [Marin County Ordinance No. 3738 (2020)] the Health Officer requests that the Sheriff, all chiefs of police in the County, and all enforcement officers ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat and menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both.

14. **Effective Date.** This Order shall become effective October 27, 2020. This Order shall continue to be in effect until it is rescinded, superseded, or amended in writing by the Health Officer.

15. **Copies.** Copies of this Order shall promptly be: (1) made available at the Bulletin Board adjacent to the entrance to the Chambers of the Board of Supervisors, Room 330, Administration Building, and in the display case in the center arch of the Hall of Justice, Marin County Civic Center, San Rafael, California; (2) posted on the County of Marin website (www.marincounty.org) as well as the County of Marin Department of Health and Human Services website (www.marinhhs.org); and (3) provided to any member of the public requesting a copy of this Order.

16. **Severability.** If any provision of this Order or its application to any person or circumstance is held to be invalid, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

IT IS SO ORDERED:

_____

Matt Willis MD, MPH
Health Officer of the County of Marin
Dated: October 27, 2020

Attachments: **Appendix A – Site-Specific Protection Plan Template**

**Appendix B-1 – Small Construction Project Safety Protocol**

**Appendix B-2 – Large Construction Project Safety Protocol**

**Appendix C-1 – Guidelines for Businesses to Operate**

**Appendix C-2 – Allowed Additional Activities**



Accessibility

Disclaimers

Terms of Use

Notice of
Nondiscrimination

YouTube

Facebook

Twitter

Nextdoor

Enter your email

**Subscribe**

Be the first to find out about updates and the latest
news in Marin County.

COUNTY OF MARIN

© 2020 County of Marin. All rights reserved.

If you are a person with a disability and require an accommodation to participate in a County program, service, or activity, requests may be made by calling (415) 473–4381 (Voice), Dial 711 for CA Relay, or by email at least five business days in advance of the event. We will do our best to fulfill requests received with less than five business days' notice. Copies of documents are available in alternative formats upon request.

# Exhibit D

 Centers for Disease Control and Prevention



## COVID-19

# Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials

Interim Guidance

Updated Aug. 6, 2020      Print

This interim guidance is based on what is currently known about coronavirus disease 2019 (COVID-19). The Centers for Disease Control and Prevention (CDC) will update this interim guidance as needed and as additional information becomes available.

Printer friendly version

### Summary of Recent Changes

A revision was made on 5/10/2020 to reflect the following:

- Revisions to document organization for clarity
- Description of "whole community" approach
- Clarification of outreach staff guidance
- Clarification of encampment guidance

People experiencing unsheltered homelessness (those sleeping outside or in places not meant for human habitation) may be at risk for infection when there is community spread of COVID-19. This interim guidance is intended to support response to COVID-19 by local and state health departments, homelessness service systems, housing authorities, emergency planners, healthcare facilities, and homeless outreach services. Homeless shelters and other facilities should also refer to the Interim Guidance for Homeless Shelters. Community and faith-based organizations can refer to the Interim Guidance for Communities of Faith for other information related to their staff and organizations.

COVID-19 is caused by a new coronavirus. We are learning about how it spreads, how severe it is, and other features of the disease.

Lack of housing contributes to poor physical and mental health outcomes, and linkages to permanent housing for people experiencing homelessness should continue to be a priority. In the context of COVID-19 spread and transmission, the risks associated with sleeping outdoors or in an encampment setting are different than from staying indoors in a congregate setting such as an emergency shelter or other congregate living facility. Outdoor settings may allow people to increase physical distance between themselves and others. However, sleeping outdoors often does not provide protection from the environment, adequate access to hygiene and sanitation facilities, or connection to services and healthcare. The balance of risks should be considered for each individual experiencing unsheltered homelessness.

# Community coalition–based COVID-19 prevention and response

Planning and response to COVID-19 transmission among people experiencing homelessness requires a "whole community" approach, which means involving partners in the response plan development, with clearly outlined roles and responsibilities. Table 1 outlines some of the activities and key partners to consider for a whole-community approach.

Table 1: Using a community-wide approach to prepare for COVID-19 among people experiencing homelessness

---

**Connect to community-wide planning**

Connect with key partners to make sure that you can all easily communicate with each other while preparing for and responding to cases. A community coalition focused on COVID-19 planning and response should include:

- Local and state health departments
- Outreach teams and street medicine providers
- Homeless service providers and Continuum of Care leadership
- Emergency management
- Law enforcement
- Healthcare providers
- Housing authorities
- Local government leadership
- Other support services like case management, emergency food programs, syringe service programs, and behavioral health support
- People with lived experiences of homelessness

People with lived experiences of homelessness can help with planning and response. These individuals can serve as peer navigators to strengthen outreach and engagement efforts. Develop an advisory board with representation from people with current or former experiences of homelessness to ensure community plans are effective.

**Identify additional sites and resources**

Continuing homeless services during community spread of COVID-19 is critical. Make plans to maintain services for all people experiencing unsheltered homelessness. Furthermore, clients who are positive for COVID-19 need to have access to services and a safe place to stay, separated from others who are not infected. To facilitate the continuation of services, community coalitions should identify resources to support people sleeping outside as well as additional temporary housing, including sites with individual rooms that are able to provide appropriate services, supplies, and staffing. These sites should include:

- Overflow sites to accommodate shelter decompression and higher shelter demands
- Isolation sites for people who are confirmed to be positive for COVID-19 by laboratory testing
- Quarantine sites for people who are awaiting testing, awaiting test results, or who were exposed to COVID-19
- Protective housing for people who are at increased risk for severe illness from COVID-19

Depending on resources and staff availability, housing options that have individual rooms (such as hotels/motels) and separate bathrooms should be considered for the overflow, quarantine, and protective housing sites. In addition, plan for how to connect clients to housing opportunities after they have completed their stay in these temporary sites.

---

# Communication

Outreach workers and other community partners, such as emergency food provision programs or law enforcement, can help ensure people sleeping outside have access to updated information about COVID-19 and access to services.

- Stay updated on the local level of transmission of COVID-19 through your local and state health departments.
- Build on existing partnerships with peer navigators who can help communicate with others.
- Maintain up-to-date contact information and areas frequented for each person.
- Communicate clearly with people sleeping outside.

- Use health messages and materials developed by credible public health sources, such as your local and state public health departments or the Centers for Disease Control and Prevention (CDC).
- Post signs in strategic places (e.g. near handwashing facilities) providing instruction on hand washing and cough etiquette ■ .
- Provide educational materials about COVID-19 for non-English speakers, those with low literacy or intellectual disabilities, and people who are hearing or vision impaired.
- Ensure communication with clients about changes in homeless services policies and/or changes in physical location of services such as food, water, hygiene facilities, regular healthcare, and behavioral health resources.
- Identify and address potential language, cultural, and disability barriers associated with communicating COVID-19 information to workers, volunteers, and those you serve. Learn more about reaching people of diverse languages and cultures.

# Considerations for outreach staff

*Staff training and policies*

- Provide training and educational materials related to COVID-19 for staff.
- Minimize the number of staff members who have face-to-face interactions with clients.
- Develop and use contingency plans for increased absenteeism caused by employee illness or by illness in employees' family members. These plans might include extending hours, cross-training current employees, or hiring temporary employees.
- Assign outreach staff who are at increased risk for severe illness from COVID-19 to duties that do not require them to interact with clients in person.
- Outreach staff should review stress and coping resources for themselves and their clients during this time.

*Staff prevention measures*

- Encourage outreach staff to maintain good hand hygiene by washing hands with soap and water for at least 20 seconds or using hand sanitizer (with at least 60% alcohol) on a regular basis, including before and after each client interaction
- Advise staff to maintain 6 feet of distance while interacting with clients and other staff, where possible.
- Require outreach staff to wear masks when working in public settings or interacting with clients. They should still maintain a distance of 6 feet from each other and clients, even while wearing masks.
- Advise outreach staff to avoid handling client belongings. If staff are handling client belongings, they should use disposable gloves, if available. Make sure to train any staff using gloves to ensure proper use and ensure they perform hand hygiene before and after use. If gloves are unavailable, staff should perform hand hygiene immediately after handling client belongings.
- Outreach staff who are checking client temperatures should use a system that creates a physical barrier between the client and the screener as described here.
  - Where possible, screeners should remain behind a physical barrier, such as a car window, that can protect the staff member's face from respiratory droplets that may be produced if the client sneezes, coughs, or talks.
  - If social distancing or barrier/partition controls cannot be put in place during screening, PPE (i.e., facemask, eye protection [goggles or disposable face shield that fully covers the front and sides of the face], and a single pair of disposable gloves) can be used when within 6 feet of a client.
  - However, given PPE shortages, training requirements, and because PPE alone is less effective than a barrier, try to use a barrier whenever you can.
- For street medicine or other healthcare staff who are providing medical care to clients with suspected or confirmed COVID-19 and close contact (within 6 feet) cannot be avoided, staff should at a minimum, wear eye protection (goggles or face shield), an N95 or higher level respirator (or a facemask if respirators are not available, or staff are not fit tested), disposable gown, and disposable gloves. **Masks are not PPE and should not be used when a respirator or facemask is indicated.** Healthcare providers should follow infection control guidelines.
- Outreach staff who do not interact closely (e.g., within 6 feet) with sick clients and do not clean client environments do not need to wear personal protective equipment (PPE).
- Outreach staff should launder work uniforms or clothes after use using the warmest appropriate water setting for the items and dry items completely.

*Staff process for outreach*

- In the process of conducting outreach, staff should
  - Greet clients from a distance of 6 feet and explain that you are taking additional precautions to protect yourself and the client from COVID-19.
  - If the client is not wearing a mask, provide them with one.
  - Screen clients for symptoms by asking them if they feel as if they have a fever, cough, or other symptoms consistent with COVID-19.
  - Children have similar symptoms to adults and generally have mild illness
    - Older adults and persons with medical comorbidities may have delayed presentation of fever and respiratory symptoms.
    - If medical attention is necessary, use standard outreach protocols to facilitate access to healthcare.
  - Continue conversations and provision of information while maintaining 6 feet of distance.
  - If at any point you do not feel that you are able to protect yourself or your client from the spread of COVID-19, discontinue the interaction and notify your supervisor. Examples include if the client declines to wear a mask or if you are unable to maintain a distance of 6 feet.
  -

# Considerations for people experiencing unsheltered homelessness

*Help clients prevent becoming sick with COVID-19*

- Consider the balance of these risks when addressing options for decreasing COVID-19 spread. Those who are experiencing unsheltered homelessness face several risks to their health and safety.
- Continued linkage to homeless services, housing, medical, mental health, syringe services, and substance use treatment, including provision of medication-assisted therapies (e.g., buprenorphine, methadone maintenance, etc.). Use telemedicine, when possible.
- Some people who are experiencing unsheltered homelessness may be at increased risk of severe illness from COVID-19 due to older age or certain underlying medical conditions, such as chronic lung disease or serious heart conditions.
  - Reach out to these clients regularly to ensure they are linked to care as necessary.
  - Prioritize providing individual rooms for these clients, where available.
- Recommend that all clients wear masks any time they are around other people. Masks should not be placed on young children under age 2, anyone who has trouble breathing, or is unconscious, incapacitated, or otherwise unable to remove the mask without assistance.
- Provide clients with hygiene materials, where available.
- Discourage clients from spending time in crowded places or gathering in large groups, for example at locations where food, water, or hygiene supplies are being distributed.
  - If it is not possible for clients and staff to avoid crowded places, encourage spreading out (at least6 feet between people) to the extent possible and wearing masks.

*Help link sick clients to medical care*

- Regularly assess clients for symptoms.
  - Clients who have symptoms may or may not have COVID-19. Make sure they have a place they can safely stay in coordination with local health authorities.
  - If available, a nurse or other clinical staff can help with clinical assessments. These clinical staff should follow personal protective measures.
  - Provide anyone who presents with symptoms with a mask.
  - Facilitate access to non-urgent medical care as needed.
  - Use standard outreach procedures to determine whether a client needs immediate medical attention. Emergency signs include (this list is not all inclusive). Please refer clients for medical care for any other symptoms that are severe or concerning to you):

- Trouble breathing
- Persistent pain or pressure in the chest
- New confusion or inability to arouse
- Bluish lips or face
  - − Notify the designated medical facility and personnel to transfer that clients might have COVID-19.
- If a client has tested positive for COVID-19
  - − Use standard outreach procedures to determine whether a client needs immediate medical attention.
  - − If immediate medical attention is not required, facilitate transportation to an isolation site.
  - − Notify designated medical facility and personnel that the client has tested positive for COVID-19.
  - − If medical care is not necessary, and if no other isolation options are available, advise the individual on how to isolate themselves while efforts are underway to provide additional support.
  - − During isolation, ensure continuation of behavioral health support for people with substance use or mental health disorders.
  - − In some situations, for example due to severe untreated mental illness, an individual may not be able to comply with isolation recommendations. In these cases, community leaders should consult local health authorities to determine alternative options.
  - − Ensure the client has a safe location to recuperate (e.g., respite care) after isolation requirements are completed, and follow-up to ensure medium- and long-term medical needs are met.

# Considerations for encampments

- If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are.
  - − Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread.
- Encourage those staying in encampments to set up their tents/sleeping quarters with at least 12 feet x 12 feet of space per individual.
  - − If an encampment is not able to provide sufficient space for each person, allow people to remain where they are but help decompress the encampment by linking those at increased risk for severe illness to individual rooms or safe shelter.
- Work together with community coalition members to improve sanitation in encampments.
- Ensure nearby restroom facilities have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and remain open to people experiencing homelessness 24 hours per day.
- If toilets or handwashing facilities are not available nearby, assist with providing access to portable latrines with handwashing facilities for encampments of more than 10 people. These facilities should be equipped with hand sanitizer (containing at least 60% alcohol).

# COVID-19 Readiness Resources

- Considerations for food pantries and food distribution sites
- Visit cdc.gov/COVID19 for the latest information and resources
- Information for health departments
- Guidance for homeless service providers
- COVID-19 fact sheets for people experiencing homelessness (at the bottom of the page)
- Department of Housing and Urban Development (HUD) COVID-19 resources ☑
- CDC's COVID-19 stress and coping information

Last Updated Aug. 6, 2020

# Exhibit E

1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7   SANTA CRUZ HOMELESS UNION, et al.,          Case No.  20-cv-09425-SVK

8              Plaintiffs,

9         v.                                    **ORDER GRANTING PLAINTIFFS'**
                                                **APPLICATION FOR PRELIMINARY**
                                                **INJUNCTION AND DIRECTING THE**
10  MARTIN BERNAL, et al.,                      **PARTIES TO FILE A STATUS**
                                                **REPORT ON MARCH 9, 2021**
11             Defendants.
                                                Re: Dkt. Nos. 1, 5, 12-15, 17, 19, 23
12

13

14        Plaintiffs Santa Cruz Homeless Union, Santa Cruz Food Not Bombs, Alicia Avalos

15  ("Avalos"), Hannah Hegel ("Hegel"), Chris Ingersoll ("Ingersoll"), and Randolph Tolley

16  ("Tolley") (collectively, "Plaintiffs") bring this Ex Parte Application for Emergency Temporary

17  Restraining Order and Preliminary Injunction against Defendants Santa Cruz City Manager Martin

18  Bernal ("Bernal"), Director of Parks & Recreation Tony Elliot ("Elliot"), Chief of Police for the

19  City of Santa Cruz Andrew Mills ("Mills"), and the City of Santa Cruz ("City") (collectively,

20  "Defendants").  Dkt. 1.

21        The Court granted Plaintiffs' temporary restraining order application on December 30,

22  2020.  Dkt. 5.  On January 6, 2021, the Court held a preliminary injunction hearing and, to allow

23  time to evaluate the Parties' arguments, the Court extended the temporary restraining order to

24  January 13, 2021.  Dkt. 11; Dkt. 12.  On January 11, 2021, Defendants filed an administrative

25  motion to submit additional evidence.  Dkt. 13.  The Court granted this request, provided Plaintiffs

26  an opportunity to respond to the new evidence, and extended the temporary restraining order to

27  January 20, 2021.  Dkt. 14.

28        As reasoned below, the City's Executive Order No. 2020-24 ("Executive Order") directing

*United States District Court*
*Northern District of California*

1   the closure of San Lorenzo Park and the Benchlands at a time when the COVID-19 pandemic is

2   surging and the City's homeless shelters are full, would leave the homeless persons camping in

3   those locales more vulnerable to COVID-19 than if they were allowed to remain in the

4   encampments.  Accordingly, the Court **GRANTS** the motion for preliminary injunction.

5   **However**, the keystone of the preliminary injunction is the current dire state of the COVID-19

6   pandemic.  As vaccines roll out and the pandemic eases, dispersal of homeless persons from the

7   encampments may no longer put them at greater risk for COVID-19, and re-evaluation of the

8   injunction will be necessary.  As it is possible, indeed highly desirable, that the pandemic eases

9   more quickly than this case proceeds to trial for injunctive relief, the Court directs the Parties to

10  keep a watchful eye on the situation and to submit periodic status reports to the Court as directed

11  below.

12  **I.       BACKGROUND**

13          The Court takes judicial notice of the nearly year long public health emergency due to

14  COVID-19.[1]  On December 3, 2020, the California Department of Public Health issued a

15  "Regional Stay at Home Order" stating "all individuals living in the Region shall stay at home or

16  at their place of residence" when intensive care unit capacity falls below 15%. Dkt. 1 ¶ 2, Exhibit

17  ("Ex.") A.  On December 16, 2020, the Health Services Agency of the County of Santa Cruz

18  issued a press release stating that the Regional Stay-at-Home Order would commence on

19  December 17, 2020. Dkt. 1 ¶ 3, Ex. B.  Recently, Santa Cruz County has seen "the largest number

20  [of new COVID cases] to be recorded in Santa Cruz since the pandemic began" and "[t]he

21  absolute number of positive tests has also increased significantly, by about 25% since before

22  Christmas."  Dkt. 23, Exs. A, B.

23          The individual homeless Plaintiffs Avalos, Hegel, Ingersoll, and Tolley have been residing

24  in the San Lorenzo Park and the Benchlands encampment ("Encampment") in Santa Cruz,

25  California for the last several months. Dkt. 1 ¶¶ 15-18.  The Encampment has grown to close to

26  

27  [1] U.S. DEPT. OF HEALTH & HUMAN SERVICES, Determination that a Public Health Emergency
    Exists (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-
28  nCoV.aspx; Cal. Exec. Order N-33-20 (Mar. 19, 2020), https://www.gov.ca.gov/wp-
    content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

United States Distr.. Court
Northern District of California

1    200 homeless persons over the last six months. *Id.* at ¶ 1. Plaintiffs argue that the residents of the

2    Encampment are fed and provided with survival services and items at that locale and will face

3    separation from vital services if the City is allowed to carry out the Executive Order. *Id.* Plaintiffs

4    support this assertion with declarations from Santa Cruz residents and homeless advocates, which

5    are discussed in detail in Section III.A.2.b. below. Dkt. 7 Declaration of Alicia Kuhl ("Kuhl

6    Decl.") ¶ 1; Dkt. 7 Declaration of Arista Bauer ("Bauer Decl.") ¶ 2; Dkt. 7 Declaration of Joy

7    Schendlecker ("Schendlecker Decl.") ¶ 2; Dkt. 7 Declaration of Katayun Salehi ("Salehi Decl.") ¶

8    2; Dkt. 7 Declaration of Reggie Meisler ("Meisler Decl.") ¶ 3.

9         The City has allowed San Lorenzo Park to be used for encampments during the past 9

10   months of the COVID-19 pandemic. Dkt. 9 at 7, 9; Dkt. 9-8 Declaration of Lee Butler ("Butler

11   Decl.") ¶ 9.[2] More particularly, in April 2020, the City and County of Santa Cruz[3] ("County")

12   attempted to implement a "socially distant" encampment layout "in deference to the CDC

13   guidance on encampments," and the City provided trash services and hygiene resources to the

14   Encampment residents.[4] Dkt. 9 at 10; Butler Decl. ¶ 10. In July 2020, the City and County

15   worked together to establish a managed camp at the Benchlands. Dkt. 9 at 11; Butler Decl. ¶ 10.

16   The City has continued to provide trash service and hygiene resources to the Encampment

17   residents, and at the hearing, defense counsel represented that the City continues to manage the

18   trash on a daily basis. Dkt. 9 at 11; Butler Decl. ¶ 11. In addition to its efforts at the

19   Encampment, the City has partnered with the County to add shelter capacity in the City at

20   Veterans' Hall, the Golflands, the Pavilion, and several motels. Dkt. 9 at 8. Despite these efforts,

21   shelters for homeless persons in the City and County of Santa Cruz are currently full. Dkt. 9 at 8,

22

23   [2] The evidence indicates that San Lorenzo Park and the Benchlands were the site of homeless
     encampments prior to the onset of the COVID pandemic as well. Dkt. 9 at 10; Dkt. 10
24   Declaration of Tony Elliot ("Elliot Decl.") ¶ 6.
     [3] The County of Santa Cruz is not a defendant in this action. Defendants proffer that it is the
25   County that receives significant funding to provide housing or other services to persons
     experiencing homelessness and operates all of the shelters within City limits. Dkt. 9 at 9; Dkt. 9-5
26   Declaration of Martin Bernal ("Bernal Decl.") ¶ 7; Dkt. 9-8 Declaration of Lee Butler ("Butler
     Decl.") ¶ 13.
27   [4] On its own motion, the Court takes judicial notice of Executive Order No. 2020-07, available
     online at https://www.cityofsantacruz.com/Home/ShowDocument?id=80108, because its contents
28   "can be accurately and readily determined from sources whose accuracy cannot reasonably be
     questioned." Fed. R. Evid. 201(b)(2), (c)(1).

United States Distr.. Court
Northern District of California

1  13; Dkt. 9-8 Butler Decl. ¶ 13.

2        On or around December 17, 2020, the City issued the Executive Order, which is the

3  catalyst for this action. Dkt. 1 ¶ 4, Ex. C; Dkt. 9 at 12; Dkt. 9-5 Declaration of Martin Bernal

4  ("Bernal Decl.") ¶ 12. Pursuant to the Executive Order, Defendants Bernal and Elliot authorized

5  and ordered the temporary closure of the San Lorenzo Park and the Benchlands, which would "be

6  accomplished in phases, with the goal of temporarily closing the entire park by January 6, 2021."

7  Dkt. 1, Ex. C. Further, "[t]he closure period will end on January 31, 2021, unless an extension of

8  the closure is authorized."[5]  Id. The Executive Order notes that "[i]n recent weeks, the conditions

9  at San Lorenzo Park have deteriorated to the extent that we feel that a temporary park closure is

10  the City's best and only realistic option." Id. Conditions noted in the Executive Order include

11  vandalism, fire safety, criminal activity, tree damage, trash, and a lack of social-distancing or

12  wearing of masks. Id. The Executive Order further states that the City had "recently paid over

13  $140,000 to clean and start the rehabilitation process of areas within the Pogonip" and that

14  "[e]specially during this time of significant budgetary constraints, we have a duty to preserve the

15  park grounds and facilities and to prevent exorbitant rehabilitation expenses from becoming

16  necessary at San Lorenzo Park." Id. In response to Plaintiffs' motion, the City has provided

17  evidence of significant hazards at the Encampment relating to health, safety, fire, and property, all

18  against the backdrop of severe fiscal financial limitations brought on by the COVID-19 pandemic.

19  The City's proffer is supported by multiple declarations and is discussed in further detail in

20  Section III.C. On December 21, 2020, the City executed the first phase of the Executive Order,

21  vacating the areas around the playground in San Lorenzo Park. Dkt. 9 at 12; Dkt. 9-7 Declaration

22  of Andrew Mills ("Mills Decl.") ¶ 15. While the second phase was scheduled to occur on

23  December 28, 2020, the City paused its efforts after large and vocal community protests. Dkt. 9 at

24  12; Mills Decl. ¶ 16.

25        It is against this backdrop that, as noted above, on December 30, 2020, Plaintiffs filed the

---

27  [5] The Executive Order describes the closure of the Encampment as "temporary." The City does not argue, and under the facts presented the Court would not agree, that the use of the word

28  "temporary" mitigates the impact of the Executive Order on the Encampment's homeless population. Accordingly, the word does not factor into the Court's analysis.

1  Ex Parte Application for Emergency Temporary Restraining Order and Preliminary Injunction,

2  which this Court granted. Dkt. 1; Dkt. 5. Having received multiple rounds of evidence from the

3  Parties and having held a hearing, the Court now rules on the motion for preliminary injunction.

4  **II.    LEGAL STANDARD:  PRELIMINARY INJUNCTION**

5      The substantive standard for issuing a temporary restraining order is identical to the

6  standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush*

7  *& Co. Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "To obtain a preliminary injunction, the

8  moving party 'must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer

9  irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor;

10  and (4) an injunction is in the public interest.'" *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039,

11  1046 (9th Cir. 2015) (quoting *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir.

12  2014)). The Ninth Circuit has adopted a "sliding-scale approach" such that "serious questions

13  going to the merits and a balance of hardships that tips sharply towards the plaintiff can support

14  issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

15  irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v.*

16  *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted). A temporary

17  restraining order or preliminary injunction is a matter of equitable discretion and is "an

18  extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

19  to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365,

20  172 L. Ed. 2d 249 (2008); *Earth Island Institute v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).

21  **III.   DISCUSSION**

22      **A.    Likelihood of Success on the Merits**

23      Plaintiffs allege that by authorizing the closure of San Lorenzo Park and the Benchlands at

24  the height of the COVID pandemic, Defendants are placing Plaintiffs in a position of danger in

25  violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and

26  Article I, Section 7 of the California Constitution. Dkt. 1 ¶¶ 39-48. More specifically, Plaintiffs

27  assert that by clearing the Encampment and failing to provide alternate safe housing, Defendants

28  are placing Plaintiffs and other similarly situated unhoused persons at greater risk of COVID-19

5

United States Distr... Court
Northern District of California

1    infection, injury, and death. *Id.* at ¶¶ 1, 43, 48.

2          **1.**     **Legal Standard: State Created Danger**

3       There is no fundamental right to housing. *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S. Ct.

4    862, 31 L. Ed. 2d 36 (1972). However, the Ninth Circuit recognizes liability under substantive

5    due process where a state or local official acts to place a person in a situation of known danger

6    with deliberate indifference to their personal or physical safety. *Kennedy v. City of Ridgefield*, 439

7    F.3d 1055, 1061-62 (9th Cir. 2006). "'[D]eliberate indifference' is a stringent standard of fault,

8    requiring proof that a municipal actor disregarded a known or obvious consequence of his action."

9    *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137

10    L. Ed. 2d 626 (1997). "In examining whether [the city] affirmatively places an individual in

11    danger, [a court does] not look solely to the agency of the individual, nor [does it rest its] opinion

12    on what options may or may not have been available to the individual. Instead, [the court must]

13    examine whether [the city] left the person in a situation that was more dangerous than the one in

14    which they found him." *Kennedy*, 439 F.3d at 1062 (citation omitted). Thus, the question before

15    the Court is whether Plaintiffs are likely to succeed in demonstrating that the City's closure of the

16    Encampment at this point in time will put the homeless persons living there at greater risk of

17    contracting COVID-19.

18          **2.**     **Evidence Presented**

19          **a.**     **The CDC Guidelines and Regional Stay at Home Order**

20       The Centers for Disease Control and Prevention's (CDC) "Interim Guidance on

21    Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service

22    Providers and Local Officials" ("CDC Guidelines"), states:

23

24          [i]f individual housing options are not available, <u>allow people who
are living unsheltered or in encampments to remain where they are</u>.

25          Clearing encampments can cause people to disperse throughout the
community and break connections with service providers. This

26          increases    the    potential    for    infectious    disease    spread.

27

28

1    Dkt. 1 at 50 (emphasis added).[6]

2    Defendants argue that because the CDC Guidelines are not binding and do not set

3    constitutional standards, this Court should not consider them in its analysis. Dkt. 9 at 23-24. In

4    support, Defendants cite *Roman v. Wolf*, 829 F. App'x 165 (9th Cir. 2020), where the court found

5    that in the context of a mandatory injunction directed at correctional and detention facilities, the

6    CDC COVID-19 Guidelines "do not provide a workable standard for a preliminary injunction."

7    *Id.* at 174. Specifically, the court noted that the CDC guidance document "spans 25 pages and

8    makes hundreds of recommendations, many of which lack specificity" and contains key caveats

9    that are fatally vague. *Id.* at 174-75.

10    *Roman* is distinguishable from the case at bar in two critical aspects. First, the plaintiffs in

11    *Roman* had been awarded a *mandatory* injunction requiring defendants to implement a series of

12    protective measures to limit the spread of COVID-19 at the facilities, including the suspension of

13    receipt of new detainees and reduction of the current detainee population. *Id.* at 168. In the case

14    before this Court, Plaintiffs are seeking a *prohibitory* injunction, to maintain the status quo at the

15    Encampment. While the legal standard for mandatory and prohibitory injunctions are the same, as

16    the *Roman* court notes, "[i]njunctions that alter the status quo 'are not granted unless extreme or

17    very serious damage will result and are not issued in doubtful cases.'" (citation omitted). *Id.* at

18    170. Second, in contrast to the guidelines discussed in *Roman*, the CDC Guidelines before this

19    Court are clear and specific: if there is no alternative housing available, leave the encampments to

20    remain where they are because clearing encampments may increase the potential for infectious

21    disease spread. Dkt. 1 at 50.[7]

22    There is further support for considering the CDC guidelines in evaluating the relative

23    COVID-19 risk to Plaintiffs. Cities and states routinely look to the CDC for guidance during this

24

25    [6] On its own motion, the Court takes judicial notice of the CDC Guidelines. *See* Fed. R. Evid.
      201(c)(1).

26    [7] At least one other appellate court has held that the CDC Guidelines "provide the authoritative

27    source of guidance on prevention and safety mechanisms for a novel coronavirus in a historic
      global pandemic where the public health standards are emerging and changing." *Mays v. Dart*,

28    974 F.3d 810, 823 (7th Cir. 2020) (finding that "[t]he district court thus properly relied on these
      Guidelines in the course of its preliminary injunction analysis").

United States Distr.. Court
Northern District of California

1     novel pandemic. Dkt. 23 at 3. This includes the City of Santa Cruz, who relied upon these same

2     CDC Guidelines in a previous Executive Order when creating and implementing an encampment

3     lay-out plan in San Lorenzo Park and the Benchlands in April 2020.[8] Dkt. 23 at 3. The CDC

4     guidelines are consistent with the California Department of Public Health's most recent Regional

5     Stay at Home Order, also adopted by the County of Santa Cruz, which states that "[a]ll

6     individuals living in the Region shall stay at home or *at their place of residence*." Dkt. 1 at 33

7     (emphasis added).[9] Finally, the Court notes that the City offers no alternative authority to that of

8     the CDC in managing the homeless population in this pandemic.

9                **b.**      **Services and Survival Items at the Encampment**

10        At the Encampment the homeless persons have shelter in the form of actual or make-shift

11     tents. Dkt. 1, Ex. G; Dkt. 23 Declaration of Hannah Hegel ("Hegel Decl.") ¶ 7, Ex. B; Dkt. 23

12     Declaration of Keith McHenry ("McHenry Decl."), Ex. A. This obvious fact is significant in light

13     of evidence that the first phase of Encampment closure led to people losing their tents and tarps.

14     McHenry Decl. ¶ 10, Ex. A. At the Encampment, the homeless population has access to services

15     and hygiene facilities. For example, multiple sources state that there are showers, portable toilets,

16     hand washing stations, and sharps disposal containers at the Encampment. Bauer Decl. ¶ 2;

17     Schendlecker Decl. ¶ 2; Salehi Decl. ¶ 2; Hegel Decl. ¶ 2; McHenry Decl. ¶ 5. Notably, one of the

18     vital services is nurses from Homeless Persons Health Project coming to the park "every couple of

19     days to check in with campers and offer medical assistance as needed."[10] Hegel Decl. ¶ 1;

20

21     [8] City of Santa Cruz Executive Order No. 2020-07 (April 30, 2020),
     https://www.cityofsantacruz.com/Home/ShowDocument?id=80108.

22     [9] The City argues that the Regional Stay at Home Order does not support Plaintiffs' application
     because it expressly excepts "persons experiencing homelessness." Dkt. 9 at 25. Defendants'

23     argument misses the mark. This state's Department of Public Health wisely excepted from an
     order to stay home those for whom compliance would be impossible because they do not have a

24     home. To the extent the state directive instructs all persons to remain at their "place of residence,"
     and to the extent the Encampment is a place of residence for the Plaintiffs and others, the Regional

25     Stay at Home Order speaks directly to the dispute at hand.
     [10] Defendants object to Ms. Hegel's statement regarding loss of vital services relating to the visits

26     of HPHP to the Encampment. Dkt. 24 at 3; Order Re Requests for Judicial Notice and Evidentiary
     Objections. In its objection, Defendants make a proffer that "HPHP outreach workers go

27     wherever homeless individuals are camping." Dkt. 24 at 3. Even accepting the proffer as true, it is
     reasonable to infer that the closure of the Encampment without any plan or direction as to where

28     the current population will re-establish themselves will lead to a break in services of some
     duration. Given the current status of the COVID-19 pandemic, any break in services is

United States District Court
Northern District of California

1    McHenry Decl. ¶ 3.  Plaintiffs also present evidence that the homeless persons receive donations

2    at the Encampment such as clothing, food, masks, and medical supplies.  Dkt. 1 ¶ 1; Salehi Decl. ¶

3    2; Meisler Decl. ¶ 3; Hegel Decl. ¶¶ 2, 4; McHenry Decl. ¶¶ 2-3, 6.

### c.    No Alternative Housing Options

5            There is no disagreement between Plaintiffs and Defendants that there are no alternative

6    shelters or individual housing options available for the people residing in the Encampment.  Dkt. 1

7    ¶ 28; Dkt. 9 at 9, 13; Bernal Decl. ¶ 9.  Despite efforts by the City and County to accommodate the

8    homeless persons during the COVID-19 pandemic, including expanding shelter capacity at

9    multiple locations (Dkt. 9 at 8-9; Butler Decl. ¶¶ 6-8), the longer-term shelters are generally full.

10    Dkt. 9 at 13; Butler Decl. ¶ 13.  Further, the County has a prioritized referral pool from which

11    vacant shelter beds are quickly filled, and the individuals encamped at San Lorenzo Park do not

12    have priority within that system.[11]  Dkt. 9 at 13; Butler Decl. ¶ 14.

### 3.    Plaintiffs' Likelihood of Success on the Merits

14            The Court finds that the Plaintiffs' are likely to succeed in demonstrating that the City's

15    dispersal of the homeless persons during the current dire situation of the COVID-19 pandemic

16    puts them at greater risk for COVID-19 than if they remain in the Encampment.  The CDC

17    Guidelines are clear and direct, stating that, as here, where there is no alternative housing

18    available, leave the encampments to remain where they are to prevent the potential for infectious

19    disease spread.  The CDC Guidelines and the Regional Stay at Home Order are instructive in

20    evaluating the risk and danger when analyzing the factors for a preliminary injunction.  The CDC

21    Guidelines discuss sanitation, hygiene materials, and handwashing facilities, and Plaintiffs present

22    unrefuted evidence of the services the homeless persons have access to at the Encampment.  Dkt.

23    1, Ex. F.

24            The Defendants' counter-arguments are unavailing.  At the hearing and in a supplemental

---

significant.
[11] The City did recently identify a portion of its limited CDBG CARES Act funding to potentially
fund short-term hotel room vouchers for individuals encamped at San Lorenzo Park. Dkt. 9 at 13;
Butler Decl. ¶ 15. However, as the length of stay would be only 2-5 days, the Court does not find
this fact to be significant. Dkt. 9 at 13; Butler Decl. ¶ 15.

United States Distr... Court
Northern District of California

1   submission, Defendants suggest that following previous dispersals of homeless encampments in

2   the COVID-era, the County did not observe an increase in positive COVID-19 cases among the

3   dispersed populations. Dkt. 15 at 2. Defendants' evidence on this point is inconclusive and

4   unpersuasive. In his declaration, City of Santa Cruz Fire Chief Jason Hajduk ("Chief Hajduk")

5   states that as a result of the CZU Lightening Complex fires in August 2020, there were 50

6   homeless persons evacuated from an encampment, in a total evacuation that exceeded 35,000

7   persons. Dkt. 19 Supplemental Declaration of Jason Hajduk ("Supplemental Hajduk Decl.") ¶¶

8   10, 11. Chief Hajduk then states that there was no significant COVID increase attributed to this

9   large-scale evacuation. *Id.* ¶ 12. The declaration is silent as to any COVID increase among the 50

10  homeless persons in particular. Further, although Chief Hajduk attests to the overall absence of an

11  increase in COVID cases in the August-October time frame (*Id.*), this statement is not tied to any

12  additional dispersals of homeless encampments.[12] Consequently, the evidence presented does not

13  support Defendants' argument that dispersal of the Encampment homeless population will not lead

14  to an increase in the risk of COVID-19 infection.

15          Defendants further urge that within or without the Encampment, the risk of infection is

16  mitigated by wearing face masks, avoiding crowds and social distancing. Dkt. 15 at 2.

17  Defendants also proffer evidence of homeless persons in the Encampment gathering in crowds and

18  not wearing face masks. Dkt. 9-10 Declaration of Cynthia Crossley ("Crossley Decl.") ¶ 4; Dkt.

19  9-11 Declaration of Cynthia McCusker ("McCusker Decl.") ¶ 2; Dkt. 10 Declaration of Tony

20  Elliot ("Elliot Decl.") ¶ 17; Dkt. 15-1 Declaration of Tony Elliot ("Supplemental Elliot Decl.") ¶

21  14; Dkt. 15-2 Declaration of Eric Grodberg ("Supplemental Grodberg Decl.") ¶¶ 3, 4, 6.

22  Defendants' point as to the wearing of face masks and social distancing is well taken. However,

23  how carefully these practices are followed in the Encampment is disputed with dueling

24  declarations and photographs submitted by both sides. Crossley Decl. ¶ 4; McCusker Decl. ¶ 2;

25  Elliot Decl. ¶ 17; Supplemental Elliot Decl. ¶ 14; Supplemental Grodberg Decl. ¶¶ 3, 4, 6, Ex. A-

26  ─────────────

27  [12] The Court takes judicial notice of the fact that the entire state of California enjoyed an all too
    brief respite from the virus in the late summer and early fall of 2020. Tracking COVID-19 in

28  California (Jan. 18, 2021, 11:00 AM), https://covid19.ca.gov/state-dashboard/; *see* Fed. R. Evid.
    201(c)(1).

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1     1, A-2, A-6; Schendlecker Decl. ¶ 2; Salehi Decl. ¶ 1; Dkt. 7 Declaration of Maria Solis Kennedy

2     ("Kennedy Decl.") ¶ 2; Dkt. 7 Declaration of Thomas Landes ("Landes Decl."); Hegel Decl. ¶ 3,

3     Ex. B; McHenry Decl. ¶ 11, Ex. A. Finally, Defendants argue that the large Encampment itself

4     presents a heightened risk of COVID-19 transmission. Dkt. 9 at 18; Supplemental Hajduk Decl. ¶

5     7. While COVID-19 transmission is a legitimate risk to any co-habitation setting, here it is

6     outweighed by the risk of dispersing the homeless persons against the CDC Guidelines and the

7     Regional Stay at Home Order, particularly when there are no safe, alternate housing options

8     available. Dkt. 1 at 50.

9         In sum, the CDC Guidelines, the Regional Stay at Home Order, and common sense dictate

10    that at what one can only hope is the height of the COVID-19 pandemic, the homeless persons

11    would be placed in a more vulnerable situation and in greater danger without access to shelter or

12    services, particularly medical services, showers, and handwashing stations, that they have been

13    receiving at this central location. *See Jeremiah v. Sutter Cty.*, 18-cv-00522-TLN-KJN, 2018 WL

14    1367541, at *5 (E.D. Cal. Mar. 16, 2018) (finding that Defendants would "knowingly place the

15    homeless at increased risk of harm if it confiscates and seizes Plaintiffs' shelters and possessions"

16    during "the recent wind, rain, and cold weather"); *see also Sanchez v. City of Fresno*, 914 F. Supp.

17    2d 1079, 1102 (E.D. Cal. 2012) (finding that Plaintiffs sufficiently alleged enough facts to support

18    a substantive due process claim based on the danger creation doctrine when Defendants timed the

19    demolitions of plaintiff's shelter and property during the onset of the winter months).

20    Accordingly, the Court finds that Plaintiffs have shown a likelihood of success on the merits of

21    their due process claim if the City cleans and clears the Encampment.

22        **B.**     **Irreparable Harm**

23         The Ninth Circuit has held that "an alleged constitutional infringement will often alone

24    constitute irreparable harm." *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ.*

25    *Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (citation omitted). Plaintiffs have shown the

26    likelihood of being placed in a position of danger in violation of their substantive due process

27    rights during the COVID-19 pandemic. Accordingly, the Court finds that Plaintiffs have

28    demonstrated that irreparable harm will result in the absence of a preliminary injunction at this

1    time.

2        **C.    Balance of Equities**

3        The balancing of the equities in the evidence before the Court presents a closer call.

4    Plaintiffs argue that the balance tips heavily in their favor, as many of Defendants' representations

5    are "a product of the City's own negligence" and could be remedied without forcing the homeless

6    persons out during the COVID-19 pandemic. Dkt. 1 ¶¶ 35-36. On the other hand, the Court

7    recognizes the significant efforts and burden the City has taken on during the pandemic, including

8    coordinating with the County to add shelter capacity at multiple sites and allowing encampments

9    at San Lorenzo Park for the last nine months. Dkt. 9 at 8-9. Further, Defendants present

10   compelling evidence of numerous concerns regarding the Encampment. The degree and severity

11   of these issues are debated by the Parties and are the subject of competing declarations.

12   Defendants contend that there are major public safety concerns, including drug use and major

13   crimes and safety incidents, including two deaths, one attempted murder, and two cases of assault

14   with a deadly weapon. Dkt. 9 at 14-15; Mills Decl. ¶¶ 6-8, 10-13. Defendants also raise serious

15   safety concerns regarding fire hazards, which poses a threat to the health and safety of the

16   encamped individuals, as well as the general public. Dkt. 9 at 16; Dkt. 9-4 Declaration of Jason

17   Hajduk ("Hajduk Decl.") ¶¶ 6-16. Defendants reference public nuisances, including human and

18   animal waste, needles, vandalism, theft of City and County property, and damage to the City's

19   trees, plantings, and grass. Dkt. 9 ¶¶ 16-17; Elliot Decl. ¶¶ 20-25; Supplemental Elliot Decl. ¶ 14.

20   Defendants' recent submissions evidence that since the date of the hearing, there have been

21   additional incidents of violence, retaliation, and vandalism at San Lorenzo Park, although whether

22   these incidents are properly attributed to the homeless persons living in the park is less clear.

23   Supplemental Elliot Decl. ¶¶ 8-12; Dkt. 23 at 4. Numerous community members have also

24   expressed their concerns regarding the Encampment. Dkt. 9-9 Declaration of Blanche Williams

25   ("Williams Decl.") ¶¶ 3-7; Crossley Decl. ¶¶ 1-6; McCusker Decl. ¶¶ 2-4; Dkt. 9-12 Declaration

26   of David Sievert ("Sievert Decl.") ¶¶ 1-3; Dkt. 9-13 Declaration of Eric Grodberg ("Grodberg

27   Decl.") ¶¶ 3-6; Dkt. 9-14 Declaration of Jeffrey Stonehill ("Stonehill Decl.") ¶¶ 3-6, 8-9; Dkt. 9-

28   15 Declaration of Louanne Hill ("Hill Decl.") ¶¶ 1-2; Dkt. 9-16 Declaration of Carrie Haake

1   ("Haake Decl.") ¶¶ 1-2; Dkt. 9-17 Declaration of Karen Dixon-Santos ("Dixon-Santos Decl.") ¶¶

2   2-5; Supplemental Grodberg Decl. ¶¶ 2-6.

3          The Court recognizes that the City currently faces multiple crises arising from the

4   pandemic. However, the City's interest in cleaning and clearing the Encampment in San Lorenzo

5   Park and the Benchlands at this moment in time is outweighed by Plaintiffs' interest in their

6   constitutional rights during what the Court can only hope is the peak of the COVID-19 pandemic.

7   Accordingly, this factor also weighs in favor of Plaintiffs.

8          **D.      Public Interest**

9          The Court recognizes the legitimate public interest of protecting the public health and

10   safety as well as the need to protect and preserve San Lorenzo Park and the Benchlands.

11   However, the Court also recognizes the public interest in "maintaining the protections afforded by

12   the Constitution to those most in need of such protection." *Cobine v. City of Eureka*, No. C 16-

13   02239 JSW, 2016 WL 1730084, at *7 (N.D. Cal. May 2, 2016). The Court finds that this

14   preliminary injunction, tightly tied to the current phase of the COVID crisis, will benefit public

15   health at large. Ensuring that the homeless persons have access to shelter and vital services during

16   the COVID-19 pandemic is imperative to help stop the spread of COVID-19 amongst the

17   population impacted by this injunction. Further, it will also help reduce the likelihood that

18   COVID-19 will spread throughout the greater Santa Cruz community, as suggested by the CDC

19   Guidelines. Accordingly, the Court finds that the public interest also weighs in favor of a

20   preliminary injunction.

21   **IV.    CONCLUSION**

22          For the foregoing reasons, the Court concludes that the Plaintiffs have met their burden to

23   show that a preliminary injunction should issue to enjoin the City from clearing San Lorenzo Park

24   and the Benchlands during the current phase of the COVID crisis. There is no dispute that the

25   current phase of the COVID-19 pandemic is one of an unprecedented rise in the rate of increase in

26   COVID-19 cases, hospitalizations, and test positivity rates throughout California and specifically

27   in Santa Cruz County. The Court recognizes the significant hardship on the City to allow the

28   Encampment to remain, but with the COVID-19 pandemic still raging, the balance of hardships

13

1    tips in favor of the Plaintiffs. The situation is fluid and the length of the COVID-19 pandemic is

2    unknown. However, the administration of vaccines is now underway.[13] As the COVID-19 crises

3    recedes, the preliminary injunction will need to be revisited. Accordingly, Plaintiffs' application

4    for preliminary injunction is **GRANTED**. The Court **ORDERS** the Parties to meet and confer

5    regarding a case schedule, to be submitted to the Court by **January 29, 2021**. The Court further

6    **ORDERS** the Parties to file a joint status report due **March 9, 2021** and sets a status hearing for

7    **March 16, 2021** to review the conditions of San Lorenzo Park and the Benchlands and the

8    homeless persons residing in the Encampment.

9        **SO ORDERED.**

10   Dated: January 20, 2021

11

12

13                                      SUSAN VAN KEULEN
                                        United States Magistrate Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   [13] CDC COVID Data Tracker, CENTERS FOR DISEASE CONTROL AND PREVENTION (Jan. 15, 2021,
     6:00 AM), https://covid.cdc.gov/covid-data-tracker/#vaccinations.

14

United States District Court
Northern District of California