UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAUSALITO/MARIN COUNTY CHAPTER OF THE CALIFORMIA HOMELESS UNION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAUSALITO, et al.,<br><br>Defendants. | Case No. 21-cv-01143-EMC<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Docket No. 1 |

The case at bar concerns an encampment of about twenty homeless people in or adjacent to Dunphy Park in Sausalito, California. These individuals have lived at the encampment for the past several months during the COVID-19 pandemic. Plaintiffs in the instant case are the Sausalito/Main County Chapter of the California Homeless Union and several of the Dunphy Park campers. They brought suit in response to Sausalito's plan to break up this encampment, move the campers to a different site, and impose a ban on day camping (which would require the campers to break camp each morning, store their equipment, and not set up camp again until the evening). Plaintiffs have asserted substantive due process claims (both federal and state) against the City of Sausalito, as well as the City Mayor, Chief of Police, City Manager, and Supervisor of the Department of Public Works. Most immediately, Plaintiffs seek to preliminarily enjoin the City of Sausalito from breaking up the Dunphy Park encampment during the current pandemic.

According to Plaintiffs, the homeless people encamped at Dunphy Park have been able to live there safely for several months during the COVID-19 pandemic, and Defendants would endanger them by forcing them to relocate to another site at Marinship Park and subjecting them

1  to the day camping ban.  Plaintiffs maintain that Marinship Park is not a suitable alternative
2  location because individuals "will be exposed to clouds of lead-based paint dust and fiberglass
3  resulting from the daily boat crushing operations immediately adjacent to the Park."  Mot. at 10.
4  As for the day camping ban, which would require individuals to break camp in the morning and
5  prevent them from setting up a new camp until the evening, Plaintiffs assert that this will put
6  campers, as well as the public, at greater risk to COVID-19 exposure compared to the status quo.
7  Mot. at 10.  Plaintiffs cite specific guidance from the CDC on unsheltered homelessness which
8  states that, "[i]f individual housing options are not available, allow people who are living
9  unsheltered or in encampments *to remain where they are*" because "[c]learing encampments can
10 cause people to *disperse throughout the community* and break connections with service providers.
11 This increases the potential for infectious disease spread."  Mot., Ex. D (CDC guidance)
12 (emphasis added).  According to Plaintiffs, Sausalito's proposed action flies in the face of this
13 CDC guidance and is being undertaken for no good reason.

Currently pending before the Court is Plaintiffs' motion for a temporary restraining order and preliminary injunction.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the motion for relief.[1]

## I.       FACTUAL & PROCEDURAL BACKGROUND

Dunphy Park consists of approximately 160,000 square feet of recreational space.  On the north side, it is bordered by Richardson's Bay.  The Dunphy Park encampment is located primarily in an area east of Dunphy Park on Humboldt Avenue, just north/northeast of 300 Locust Street.  *See* McGowan Decl. ¶ 4 & Ex. 4 (map).

It appears that the Dunphy Park encampment began on or around December 28, 2020, with one individual setting up camping gear in the area.  *See* Rohrbacher Decl. ¶ 4.  It grew over the

---

[1] A similar action was recently brought by the Santa Cruz Homeless Union against the City of Santa Cruz and several of its employees.  That case is currently before Judge Van Keulen.  In late January 2021, Judge Van Keulen granted the plaintiffs a preliminary injunction that prevented Santa Cruz from "clearing San Lorenzo Park and the Benchlands during the current phase of the COVID crisis."  *Santa Cruz Homeless Union v. Bernal*, No. 20-cv-09425-SVK, 2021 U.S. Dist. LEXIS 14881, at *22-34 (N.D. Cal. Jan. 20, 2021) (adding, however, that "[a]s the COVID-19 crises recedes, the preliminary injunction will need to be revisited").

United States District Court
Northern District of California

course of the next month to a number of individuals. According to the Chief of Police, by February 8, 2021, there were about ten or eleven campers, "the majority of whom claimed to be displaced from their boats where they resided, within Richardson's Bay Regional Authority ('RBRA') jurisdictional waters." Rohrbacher Decl. ¶ 5. *See, e.g.*, Arnold Decl. ¶ 1 (testifying that the City "began pushing us into waters governed by the RBRA" and that the Richardson's Bay Regional Board told him to "leave my boat or I would be removed by the Marin County Sheriff because I had allegedly left my boat unattended for a few days"; adding that his "boat lost its 'legacy status' as an exception to the Sausalito City marina rules and was destroyed at a crushing facility located in Marinship Park"). By February 16, 2021, there were about twenty people in the encampment. *See* Rohrbacher Decl. ¶ 6.

The encampment itself is made up of a collection of tents. *See* Supp. Prince Decl. ¶ 3; *see also* Powelson Decl. ¶ 13 & Ex. B (photograph). The campers have procured at least one portable toilet and handwashing station for common use, *see* Powelson Decl. ¶ 3 & Ex. B (photograph); Supp. Powelson Decl. ¶ 3 & Ex. B (photographs), and established a communal kitchen as well. *See* Powelson Decl. ¶ 5 & Ex. B (photographs). Donations from the broader community have been given to the campers, including but not limited to food. *See* Powelson Decl. ¶¶ 6, 13; Supp. Powelson Decl. ¶ 4 (listing more than a dozen organizations that have provided assistance with "food, water, clothing, basic survival gear and COVID-19 related hygiene products"). The campers appear to have lived there peacefully and without incident. *See* Powelson Decl. ¶ 7 (testifying that there have not been any arrests of campers for "unlawful behavior"). *Compare Santa Cruz Homeless*, 2021 U.S. Dist. LEXIS 14881, at *19-20 (acknowledging that there was some evidence related to "drug use and major crimes and safety incidents" at the encampment – but still granting campers relief in the end).

Notably, the Dunphy Park encampment has taken steps to reduce exposure to and transmission of COVID-19. Tents, for example, are spaced approximately six to ten feet apart ("except in the case of family units"). Supp. Prince Decl. ¶ 3. Campers have also purchased masks and hand sanitizers/wipes to be used in the encampment. *See* Powelson Decl. ¶ 3 & Ex. B (photographs of masks, sanitizers, etc.). In contrast, to date, the City has not provided any

1   pandemic-related assistance to the encampment.  *See* Powelson Decl. ¶¶ 3, 5 (testifying that the
2   City has not provided handwashing stations or masks and has not offered COVID-19 testing; also
3   testifying that the City has not unlocked bathrooms that could be used in Dunphy Park).

4         On February 5, 2021, the Sausalito City Council approved two resolutions regarding
5   homelessness in the City and the encampment at Dunphy Park (Resolutions Nos. 6008 and 6009).
6   *See* Scoble Decl. ¶ 3.

7         In Resolution No. 6008, the City Council "affirm[ed] its commitment to continue to work
8   with its regional and local partners to explore every opportunity to provide shelter and care to
9   those without a home and to treat all individuals experiencing homelessness with compassion and
10  dignity."  Scoble Decl., Ex. 1 (Resolution No. 6008).

11        In Resolution No. 6009, the City Council essentially prohibited all day camping.  In
12  addition, the City Council prohibited all overnight camping, "except for area(s) of Marinship Park
13  designated by the Interim City Manager or her designee . . . by persons who have no option to
14  sleep indoors, pending further action by the City Council."[2]  Scoble Decl., Ex. 2 (Resolution No.
15  6009) (emphasis added).  To be clear, overnight camping at Marinship Park is permitted, but day
16  camping is not: "All persons camping overnight must remove all camping facilities and personal
17  property from Marinship Park between the hours of thirty (30) minutes after sunrise to thirty (30)
18  minutes before sunset."  Scoble Decl., Ex. 2.

19        As part of Resolution No. 6009, the City Council recognized that there is currently an
20  encampment at Dunphy Park.  However, according to the Council, the Dunphy Park "encampment
21  is not an appropriate location because of its proximity to Richardson's Bay and Dunphy Park and
22  lack of access to restrooms, showers and other sanitary services and thus poses health, welfare and
23  safety risks to the persons living in the encampment and the environment."  Scoble Decl., Ex. 2.
24  The City Council determined that "Marinship Park . . . is a more appropriate public[ly]-owned
25  location within the City for overnight sleeping by people without homes who have no option to
26  sleep indoors, due to its access to restrooms, mobile showers, sanitary services, trash collection,

---

[2] Marinship Park is located about 0.6 miles from Dunphy Park.  *See* McGowan Decl. ¶ 8.

4

and other factors." Scoble Decl., Ex. 2.

On or about February 9, 2021 – *i.e.*, a few days after the Resolutions were passed – the Police Department posted Notices to Vacate around the Dunphy Park encampment and "orally communicated the substance of such notices, to the extent possible, with individuals at the encampment." Rohrbacher Decl. ¶ 18. The Notice to Vacate stated in relevant part that

> [t]he unauthorized use of Dunphy park for camping purposes and the storage of personal property thereon has been determined to pose serious health, welfare and safety risks to the persons living in the encampment and to the environment that adversely affect residential and commercial uses due to the location's proximity to Richardson Bay, and lack of access to restrooms, showers and other sanitary services.
>
> PURSUANT TO ITS AUTHORITY UNDER SAUSALITO MUNICIPAL CODE SECTION 13.28.010, THE CITY HAS MANDATED THE CLOSURE OF ALL CITY-OWNED AND CITY-CONTROLLED PROPERTY TO OVERNIGHT CAMPING, EXCEPT THE DESIGNATED AND SIGN[-]POSTED AREA WITHIN MARINSHIP PARK . . . AS A TEMPORARY, TRANSITIONAL OVERNIGHT CAMPING LOCATION FOR INDIVIDUALS WHO HAVE NO OPTION OF SLEEPING INDOORS.
>
> THE PUBLIC WORKS DEPARTMENT WILL CLEAER AND CLOSE THIS SITE AT APPROXIMATELY 9 a.m. ON TUESDAY, FEBRUARY 16, 2021, CONDITIONED ON THE AVAILABILITY OF STORAGE AT MARINSHIP PARK. ALL PERSONS ARE DIRECTED TO VACATE THIS SITE AND REMOVE ANY PERSONAL BELONGINGS.

Scoble Decl., Ex. 11 (Notice to Vacate); *see also* McGowan Decl. ¶ 12 (testifying that storage units have been set up at Marinship Park "for the daytime storage of personal belongings necessary for overnight camping for individuals who choose to camp overnight at Marinship Park").

On February 16, 2021, the Police Department and Public Works Department tried to clear and close the Dunphy Park encampment. The Departments spoke with encampment members and the public for about two hours. "After doing so, it was determined that clearing and closing the Encampment would not be feasible that day." Rohrbacher Decl. ¶ 19. At the hearing on the pending motion, Defendants represented that they would not pursue clearing and closing the Dunphy Park encampment pending the Court's resolution of Plaintiffs' motion for relief.

## II. DISCUSSION

### A. Legal Standard

As noted above, in the pending motion, Plaintiffs ask for both a temporary restraining order ("TRO") and a preliminary injunction that will allow them to stay at Dunphy Park. The standard for issuing a TRO and that for issuing a preliminary injunction are essentially the same. *See Missud v. Cal.*, No. C-14-1503 EMC, 2014 U.S. Dist. LEXIS 73376, at *1 (N.D. Cal. May 28, 2014). The moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equity tips in its favor; and (4) the injunction is in the public interest. *See Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)). Although, in the instant case, Plaintiffs have asked for both a TRO and a preliminary injunction, the Court focuses on whether a preliminary injunction is warranted as that appears to be the preferred relief being sought.[3]

Following the Supreme Court's decision in *Winter*, the Ninth Circuit has clarified that its "sliding scale" approach to preliminary injunctive relief is still viable. That is, if the plaintiff can demonstrate the risk of irreparable injury, under the sliding scale test, the strength of the plaintiff's showing on the merits necessary to secure a preliminary injunction varies with the degree to which the balance of hardship tips in its favor. In other words, preliminary injunctive relief "'is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### B. Irreparable Injury

As indicated above, if Defendants were allowed to enforce Resolution No. 6009, the Dunphy Park campers would be affected in two ways: (1) they would be forced to relocate to Marinship Park and (2) they would not be allowed to day camp any longer. Plaintiffs assert that both aspects of the City's planned enforcement will place their health and safety in danger and

---

[3] Defendants have not made any argument that preliminary injunctive relief is premature and that the Court should consider at this juncture only a TRO.

6

thus threaten irreparable injury. Below the Court examines the asserted harms stemming from the two proposed actions.[4]

       1.      <u>Ban on Day Camping</u>

With respect to the ban on day camping, Plaintiffs have shown the ban would likely put them and other Dunphy Park campers (not to mention the broader public) in danger in light of the COVID-19 pandemic. A ban on day camping would likely endanger Plaintiffs and other Dunphy Park campers because they would have to break camp each morning and not be able to set up a new camp until the evening. This would likely cause dispersal of the campers during the day even if the campers are given access to storage units to store their property and even if they intend to return and reconstitute the camp in the evening. The CDC has given guidance indicating that encampments should not be broken down during the pandemic precisely because such is likely to lead to dispersal which, in turn, heightens the risk that the disease will spread.[5] *See* Mot., Ex. D (CDC guidance) (explaining that, "[i]f individual housing options are not available, allow people who are living unsheltered or in encampments *to remain where they are*" because "[c]learing encampments can cause people to *disperse throughout the community* and break connections with service providers" which thereby "increases the potential for infectious disease spread") (emphasis added); *see also Santa Cruz Homeless*, 2021 U.S. Dist. LEXIS 14881, at *11-12, 14-15 (noting that the CDC guidance is "clear and specific" and is "instructive in evaluating the risk and danger when analyzing the factors for a preliminary injunction"). Moreover, Defendants "offer[] no

---

[4] In evaluating the evidence presented in conjunction with this motion, the Court notes that the evidentiary rules are somewhat relaxed (as both parties conceded at the hearing). *See, e.g.*, *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (noting that "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial[;] [thus], [t]he trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm"); *Sierra Club, Lone Star Chap. V. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) (noting that, "at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence"); *cf.* Moore's Fed. Prac. Civ. § 65.23[2] (stating that "[t]he requirements of Rule 56(c)(4) for affidavits in support of a motion for summary judgment are not expressly applicable to affidavits in support of a preliminary injunction").

[5] At the hearing, Defendants noted that, even if day camping is permitted, dispersal of campers can still happen. This is true. Nevertheless, breaking down a camp is essentially putting a thumb on the scales in favor of dispersal.

alternative authority to that of the CDC in managing the homeless population in this pandemic." *Id.* at *12.

The ban on day camping also creates other dangers related to COVID-19. For example:

- Requiring the Dunphy Park campers to break down and set up camp anew each day encourages interaction among the campers without social distancing. The Dunphy Park campers appear to have established a community of sorts, as reflected by their maintenance of a communal kitchen and their procurement of a portable toilet and handwashing station for common use. As a community, campers are likely to assist one another in breaking camp and setting it up again, especially because some campers have physical impairments or are disabled. *See* Powelson Decl. ¶ 5 (noting that disabled persons will need assistance). Even if campers could individually break down their own tents and set them back up again, the communal kitchen would likely require some joint effort. And notably, all of the above is action that would need to be taken on a *daily* basis (in fact, twice a day); this would not just be a one-time event where, in theory, it might be easier to institute special procedures to avoid COVID-19 exposure. Furthermore, Plaintiffs represent that the communal kitchen serves to receive regularly donated food and supplies. Absent the communal kitchen, a central point at which food can be collected, stored and cooked, homeless individuals forced from the encampment during the day would most likely have to seek sustenance throughout the community. This is precisely the kind of risk against which the CDC guidance warns.
- Although Defendants have set up storage units to alleviate the burden of no day camping, the storage units could actually encourage the spread of COVID-19.[6] For instance, there appear to be only twelve units total. Because the Dunphy Park campers number in the twenties, this could mean that units would need to be

---

[6] For purposes of this order, the Court need not address Plaintiffs' contentions that the units are not secure and that they are not big enough to accommodate all property (such as parts of the communal kitchen).

8

shared.  Also, the units are made up of wire mesh and are constructed so that six are grouped together in one broader unit.  Therefore, even if a unit contained only one person's belongings, those belongings could come into contact with another person's belongings.[7]  Finally, there is no indication that units would be "reserved" for specific people; therefore, it is likely that one unit would be used over the course of days by multiple people (and without cleaning of the unit each day).

Finally, although Plaintiffs' focus has largely been on the COVID-19-related danger from the day camping ban, it is worth noting that the ban can also impact individuals in other ways.  For example, even if campers use the storage units, they will likely need to keep with them water jugs (*i.e.*, because use of public water fountains during the pandemic seems ill advised), and carrying such jugs during the course of a day could well pose a significant physical burden on homeless individuals, particularly for those who are disabled.  *See* Arnold Decl. ¶ 4; McGregor Decl. ¶ 2.

2. <u>Move to Marinship Park</u>

As for the forced move to Marinship Park, Plaintiffs argue that this would endanger them based on the specific environmental conditions there.  In particular, Plaintiffs argue that the site for the Marinship Park encampment is in close proximity to a boat crushing operation managed by the U.S. Army Corp of Engineers, which means that they would be "exposed to clouds of lead-based paint dust and fiberglass resulting from the daily boat crushing operations [there]."[8]  Mot. at 10; *see also* Supp. Prince Decl. ¶ 10 (testifying, *inter alia*, that a debris-filled dumpster and the

---

[7] The Court acknowledges that the wire mesh does provide for ventilation which could help prevent some COVID-19 spread.

[8] At the hearing, Plaintiffs implicated other conditions at Marinship Park but they do not drive the Court's analysis.  For example, Plaintiffs argued that the conditions at Marinship Park are dangerous because the bathrooms there are not stocked with hand soap, paper towels, and/or hand sanitizer which would encourage the spread of COVID-19.  But this condition – as Plaintiffs conceded – could easily be cured.  Plaintiffs also argued that, because the proposed encampment area at Marinship Park is on a grassy field, rainy conditions will make the encampment muddy such that tents cannot be pitched.  *See* Supp. Prince Decl. ¶ 6 (testifying that the encampment at Dunphy Park is on higher ground that the proposed encampment at Marinship Park and that the Dunphy Park encampment is "free of water and mud").  However, at this juncture, without more specific evidence, the Court is not convinced that the grassy field on Marinship Park would likely expose Plaintiffs or other Dunphy Park campers to a significant health risk as a result of the field condition.

9

1    boats are all located approximately 25 feet from the chain-link fence that separates the operation
2    from Marinship Park").
3         The evidence that Plaintiffs have presented in support of their position is concededly thin
4    as there is no information about the frequency and intensity of the operation and the level of dust
5    created. On the other hand, neither have Defendants submitted contrary evidence demonstrating
6    the environmental safety of the area. At the hearing, defense counsel simply made the contention
7    that the boat yard is a hundred or hundreds of yards away. That assertion appears to be erroneous.
8    Based on the Court's own site visit, it is clear that the yard is directly on the opposite side of the
9    chain-link fence at the end of the grassy field. Defendants have also objected to much of the
10   evidence that Plaintiffs have offered. *See, e.g.*, Docket No. 18 (Obj. Nos. 18-21). However, even
11   if the Court were to sustain the bulk of Defendants' objections, the record before the Court would
12   still reflect that there is a boat crushing operation in the area which raises concerns about the
13   propriety of having individuals *live* in the area (rather than, *e.g.*, play tennis there or take a shower
14   through the mobile showering program). Again, the City has not provided any data or evidence
15   about the environmental safety of using the grassy field adjacent to the boat yard as an
16   encampment. Nor is there any evidence of any undertaking by the City to study the environmental
17   safety prior to its decision to more the encampment to Marinship Park.[9]

18        3.    Violation of Constitutional Rights

19        For the foregoing reasons, Plaintiffs have sufficiently shown that, in the absence of a
20   preliminary injunction, they are likely to suffer irreparable injury. Moreover, the Court notes that
21   a violation of a person's constitutional rights may also constitute irreparable injury, *see Monterey*
22   *Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (noting that "'an alleged constitutional

---

[9] Plaintiffs have also suggested that, even if there were no environmental safety concerns with Marinship Park, a forced move would still endanger the Dunphy Park campers because the act of relocation itself poses COVID-19-related concerns. For purposes of this order, the Court need not address this asserted danger, particularly because the evidence of record is minimal. *See* Powelson Decl. ¶ 3 (testifying that "I will have to help my campmates with physical disabilities in moving their possessions" which will require him "to handle their possessions and tents and load them into my truck for transport"; adding that "I will likely be compelled to give them a lift as well where they will have to ride in the cab of the truck with me"). At this juncture, the Court notes that there may well be some COVID-19-related risk; on the other hand, there could well be ways to have a move safely done (*e.g.*, particularly if there were City assistance).

10

infringement will often alone constitute irreparable harm'"); *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) (stating that, "[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm"), *rev'd on other grounds*, *Nat'l Aero. & Space Admin. v. Nelson*, 56 U.S. 134 (2011), and here Plaintiffs have asserted a violation of their due process rights. As discussed below, the substantive due process claims turn on whether there is a state-created danger, which duplicates much of the analysis on irreparable injury above.

C.     Balance of Hardship

While the denial of a preliminary injunction would pose a risk to the health and safety of the Dunphy Park campers, there is practically no evidence of harm if an injunction were to be granted. The City cites a concern for the health of the campers at Dunphy Park stemming from (1) the lack of permanent bathrooms (which would include not only toilets but also sinks/running water for handwashing) and (2) the lack of access to showers. However, the campers have procured at least one handwashing station as well as a portable toilet that is regularly serviced. (Plaintiffs represented at the hearing that the encampment plans to secure a second portable toilet.) Defendants have admitted that there is no evidence of, *e.g.*, any sewage spill or other problems with waste related to the portable unit. Moreover, there are permanent bathrooms in Dunphy Park. Although Defendants argue that these bathrooms are not conveniently located because they are on the opposite side of the park, it appears that the bathrooms are still within walking distance and thus are useable – that is, except for when (as Plaintiffs contend, and without a clear dispute by Defendants) the bathrooms are locked (*e.g.*, at night) which would appear to be a matter entirely within Defendants' control.

As for access to showers, the City asserts that the mobile showering program that currently serves Marinship Park cannot be deployed at Dunphy Park to serve campers there because there is, *e.g.*, no water hookup or room to park. However, based on the Court's own site visit, there is a hose bib at the corner of the entrance road and Bridgeway; furthermore, there appear to be a number of spots where the mobile showering truck/trailer could park for several hours in relatively close proximity to the Dunphy Park encampment. The Court does not find convincing

Defendants' contention that the mobile showers cannot be placed and operated in proximity to Dunphy Park.

In addition to the above, the Court notes that, although Defendants purport to be concerned about the health and safety of Dunphy Park campers, they have presented no evidence that City officials or employees have visited the camp and taken steps to ensure that, *e.g.*, the CDC guidance on such encampments (*e.g.*, 12' x 12' spacings between tents) is being observed. In contrast, the campers have voluntarily taken steps to reduce COVID-19 exposure and spread, and their efforts have apparently paid off as there is no evidence that COVID-19 has spread among the campers at Dunphy Park.

Finally, to the extent Defendants claim some kind of hardship because the current encampment borders on and possibly encroaches on BCDC jurisdictional waterfront land, the Court notes that, at this juncture, there is no evidence (other than unsubstantiated hearsay) that BCDC objects to the encampment and seeks its removal. The City has presented no evidence of environmental degradation or contamination from the encampment.

Thus, at this juncture, the balance of hardship tips decidedly in Plaintiffs' favor. To be sure, that tipping is more compelling with respect to the proposed ban on day camping than the proposed relocation of the encampment, and that may have implications for future proceedings herein as discussed below.

D.  Likelihood of Success on the Merits/Serious Questions on the Merits

Given that the balance of hardship tips sharply in Plaintiffs' favor (at least based on the present record), Plaintiffs need only raise serious questions on the merits in order to obtain preliminary injunctive relief. Plaintiffs assert that they are likely to prevail on the merits but that, at the very least, there are serious questions as to whether Defendants' proposed actions violate substantive due process.

As Plaintiffs note, the Ninth Circuit recognizes a substantive due process claim where there is a "state-created danger" – *i.e.*, where a state actor "'affirmatively place[s] an individual in danger' by acting with 'deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it.'" *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006); *see also id.* at

12

1061 (noting that state action affirmatively places a plaintiff in a position of danger "where state action creates or exposes an individual to a danger which he or she would not have otherwise faced").[10]  In many cases, the state-created danger arises from "private violence."  *Id.*  For example, in *Kennedy*, the plaintiff filed suit against a city and a police officer after her neighbor's son – whom she had told the police had molested her child – shot her and shot and killed her husband.  *See id.* at 1058 (noting that, according to the plaintiff, the officer promised to give notice "prior to any police contact with the Burns family about her allegations" but failed to give advance notice; also, after belatedly telling the plaintiff about his contact with the neighbor, the officer gave the assurance that the policy would patrol the area around her house and the neighbor's house).  But that is not the only situation where there is a state-created danger.  In *Kennedy* itself, the Ninth Circuit cited to cases where the state-created danger was, effectively, from the environment.  *See id.* at 1061 n.1 (citing *White v. Rochford*, 592 F.2d 381 (7th Cir. 1989), where "defendants left helpless minor children subject to inclement weather and great physical danger without any apparent justification'"); *id.* at 1062 (citing *Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000), which held that "police officers could be held liable for the hypothermia death of a visibly drunk patron after ejecting him from a bar on a bitterly cold night").

In the instant case, Defendants do not dispute that the state-created danger theory is viable in the Ninth Circuit.  *See also Santa Cruz Homeless*, 2021 U.S. Dist. LEXIS 14881, at *9 (N.D. Cal. Jan. 20, 2021) (considering the doctrine in a similar case involving an encampment in Santa Cruz).  Instead, Defendants primarily argue facts – *e.g.*, contending that they have not affirmatively placed any of the Dunphy Park campers in danger because Marinship Park is a superior location to Dunphy Park given COVID-19 concerns.  For the same reason, Defendants assert that they have not acted with deliberate indifference.

But for the reasons stated above, the proposed enforcement of Resolution No. 6009 creates a risk to the health and safety of the campers at Dunphy Park, as well as the general public.  At the very least, Plaintiffs have demonstrated at this juncture a serious question on the asserted health

---

[10] The Ninth Circuit has reaffirmed the state-created danger doctrine in *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018), and *Patel v. Kent Sch. Dist.*, 648 F.3d 965 (9th Cir. 2011).

risks.

As to the matter of Defendants' intent – *i.e.*, have they acted with deliberate indifference to the danger – Defendants have offered no good reason that justifies the ban on day camping. Defendants have not explained why they have chosen to take action that flies in the face of CDC guidance. The facts, as presented thus far, strongly suggest that Defendants, in enacting this ban, have done so in spite of, not in furtherance of, public health. There is a strong argument that Defendants have acted in reckless disregard for the campers' health and safety. Thus, Plaintiffs have made a strong showing (and at the very least raised a serious question) that the ban on day camping under the circumstances of this case violates due process.

With respect to the proposed move to Marinship Park, plaintiffs' showing is not as strong as that regarding the ban on day camping; nevertheless, there is still a serious question whether Defendants have acted in reckless disregard for the safety of the campers. As noted above, it appears Defendants took no concrete steps to ensure the environment around the proposed site is safe from the boat crushing operation. Moreover, although Defendants contend Marinship Park is superior to Dunphy Park because there are more facilities for hygiene (*e.g.*, permanent bathrooms with running water as opposed to the portable toilet), it is notable that, on the day of the attempted move to Marinship Park (*i.e.*, February 16, 2021), the bathrooms there were not equipped with paper goods, soap or sanitizers, etc. *See generally* Supp. Powelson Decl.; Supp. Prince Decl. Furthermore, it appears that Defendants made no attempt to clean the bathrooms and make them fully useable to the campers, thus seemingly belying Defendants' avowed concern for the hygienic health of the same. The fact that there has been no documented harm from the current encampment and that Defendants have not taken action to ensure the health and safety of the campers while they are in Dunphy Park supports an inference that Defendants have not acted in the best interests of the campers in ordering the move.

Finally, the fact that Resolution No. 6009 requires *both* the move of the encampment and the day camp ban suggests that Defendants' intent should be viewed as a whole and in context. The two actions taken in tandem raise serious questions whether Defendants were truly motivated by a concern for the health and safety of the Dunphy Park campers in enacting Resolution

14

No. 6009.

Accordingly, Plaintiffs have, on this record, raised a serious question on the merits of their due process claim sufficient to warrant a preliminary injunction.

E.   Public Interest

Because Defendants' proposed action appears to increase rather than decrease health risks to both campers as well as the surrounding community, the public interest, if anything, weighs in favor of a preliminary injunction. *Cf. Santa Cruz Homeless*, 2021 U.S. Dist. LEXIS 14881, at *21-22.

F.   Summary

For the foregoing reasons, the Court concludes that Plaintiffs are entitled to preliminary injunctive relief. Defendants, and those acting in concert with them, are enjoined from (1) enforcing the day camping prohibition in Resolution No. 6009 and (2) closing and/or clearing the Dunphy Park encampment.

As to (1), however, the Court notes that, as the COVID-19 situation changes, the preliminary injunction may need to be revisited. *Cf. Santa Cruz Homeless Union*, 2021 U.S. Dist. LEXIS 14881, at *23 (noting that, "[a]s the COVID-19 crises recedes, the preliminary injunction will need to be revisited"). The calculation of safety risks and the balance of hardships could change if the pandemic recedes.

As for (2), as noted above, Plaintiffs' showing is less robust and so the balance of hardships and showing of endangerment is not as strong as compared to (1). The Court does not preclude Defendants from filing a motion to modify or dissolve that specific preliminary injunctive relief if, *e.g.*, they demonstrate there are no toxic risks at the proposed encampment site at Marinship Park and that the move can be safely accomplished. *See Anderson v. Central Point Sch. Dist.*, 746 F.2d 505, 507 (noting that a "district court retains jurisdiction to modify the terms of its injunction in the event that a change in circumstances requires it"); *see also Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000) (stating that "[a] party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction"). Such a showing could alter the balance of hardships

15

and ameliorate the risk of irreparable injury to Plaintiffs.[11]

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is granted. Defendants, and those acting in concert with them, are enjoined from (1) enforcing the day camping prohibition in Resolution No. 6009 and (2) closing and/or clearing the Dunphy Park encampment.

A Case Management Conference is scheduled for 9:30 a.m., April 1, 2021. A Joint Case Management Conference Statement shall be filed by March 25, 2021.

**IT IS SO ORDERED**.

Dated: March 1, 2021

_____
EDWARD M. CHEN
United States District Judge

---

[11] As suggested in note 4, *supra*, the urgency of obtaining a preliminary injunction may well impact the ability of a party (whether the plaintiff or the defendant) to develop evidence in support of its position. Here, because of the urgency of the situation, both parties likely did not have a chance to adequately build evidence on whether there is a danger related to the boat crushing operation. The Court also notes that Plaintiffs did not offer most of their evidence until they filed their reply brief, which deprived Defendants of the opportunity of offering rebuttal evidence. The Court would take into account these circumstances should Defendants file a motion to modify or dissolve the preliminary injunction.

16