1
2
3
4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    SAUSALITO/MARIN COUNTY                    Case No. 21-cv-01143-EMC
     CHAPTER OF THE CALIFORMIA
8    HOMELESS UNION, et al.,
                                               ORDER GRANTING DEFENDANTS'
9               Plaintiffs,                     MOTION TO MODIFY PRELIMINARY
                                               INJUNCTION
10          v.
                                               Docket No. 27
11   CITY OF SAUSALITO, et al.,

12              Defendants.

13

14

15          Previously, the Court granted Plaintiffs' motion for a preliminary injunction. The

16   preliminary injunction barred Defendants, and those acting in concert with them, from (1)

17   enforcing the day camping prohibition in Resolution No. 6009 and (2) closing and/or clearing the

18   Dunphy Park encampment. *See* Docket No. 20 (order). In its order, however, the Court expressly

19   noted that it was not precluding Defendants from filing a motion to modify or dissolve the second

20   part of the preliminary injunctive relief if they could, *e.g.*, show "there are no toxic risks at the

21   proposed encampment site at Marinship Park and that the move [from Dunphy Park to Marinship

22   Park] can be safely accomplished." Docket No. 20 (Order at 15). The Court added that, in all

23   likelihood, neither party had time to adequately build evidence on whether there was a danger

24   related to the boat crushing operation near Marinship Park; furthermore, Plaintiffs did not offer

25   most of their evidence until their reply brief, which deprived Defendants of the opportunity of

26   offering rebuttal evidence. *See* Docket No. 20 (Order at 16 n.11).

27          Defendants now move to modify or partially dissolve the preliminary injunction so that the

28   City may move the encampment from Dunphy Park to Marinship Park. The Court held a hearing

on the motion on April 29, 2021, and, subsequently, an evidentiary hearing on May 14, 2021. Having considered the parties' briefs, the evidence provided in support (both documentary and testimonial), and the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion.

## I.    DISCUSSION

"A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). Here, Defendants argue that there is a significant change in facts – to wit, they have conducted environmental testing of Marinship Park which reflects that people may safely camp in the area. This fact informs the preliminary injunction issues of irreparable injury and balance of hardships. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (considering as one factor in assessing a motion for preliminary injunctive relief whether the party moving for such relief would likely suffer irreparable harm in the absence of relief). It would also inform Plaintiffs showing on the merits that there is no danger (state created or otherwise ) to having people camp in Marinship Park. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) (recognizing a substantive due process claim where there is a "state-created danger" – *i.e.*, where a state actor "'affirmatively place[s] an individual in danger' by acting with 'deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it'").

The Court finds that Defendants have sufficiently established, in fact, there is no significant danger to people living in Marinship Park. The Court focuses on the issue of danger because Defendants have provided evidence that Marinship Park is a location that can feasibly house campers. The space available at Marinship Park is larger than that available at Dunphy Park. There appears to be no issue regarding private property encroachment at Marinship Park. The Marinship Park area, including facilities, has been improved and/or readied since the initial TRO/preliminary injunction hearing. The City has arranged for safe transportation to Marinship Park, employing resources so that each camper can be moved individually.[1] Mobile showering

---

[1] Post-hearing, Defendants provided (per the Court's request) information on how many people at the Dunphy Park encampment have received the COVID-19 vaccination. It appears that the

will be provided at Marinship Park. Furthermore, there is no indication that the City has any plan to evict campers from Marinship Park – permanently or temporarily (*e.g.*, because the park is being used for an event) – once campers are moved there. It appears, for example, there will be no annual wine and art festival at the site this year.

With respect to Plaintiffs' claim of environmental danger, the Court finds that Defendants' expert, Mr. Deignan, is qualified and credible. Mr. Deignan conducted environmental testing, including both air sampling and soil sampling. The Court focuses on air sampling because Plaintiffs' main concern has been the quality of the air in Marinship Park due to the nearby boat crushing operation. Plaintiffs have expressed concern about fiberglass dust being released into the air because boats can be made from (at least in part) fiberglass.

Mr. Deignan conducted his testing on a day (March 11, 2021) when three boats were destroyed or otherwise disposed of, one of which was fiberglass.[2] Mr. Deignan was informed by the RBRA and/or US ACE that this was an appropriate representation of work at the site, and there is no evidence to the contrary. The fact that, on a different day, three fiberglass boats were scheduled for destruction does not, in and of itself, mean that the demolition that took place on March 11 was not representative. Mr. Deignan set up air samplers at two locations in Marinship Park: one sampling site was next to the fence line between the boat crushing operation and the lawn area of Marinship Park (with the air samplers facing west); the other sampling site was near the rest rooms at the tennis courts (with the air samplers facing east). The prevailing winds on March 11 were Northeasterly which would have transported air from the boat crushing operation toward the air samplers in Marinship Park. (The typical prevailing winds are Westerly or Northwesterly.)

The results of the testing showed that the area was safe – *e.g.*, "PCM fiber air samples . . . at the fence line and rest rooms were reported as <0.001 fibers per cc, which is well below

---

number is relatively small. *See* Docket No. 46 (Rohrbacher Decl. ¶ 9) (testifying that 3 people have been fully vaccinated and 8 partially vaccinated). The Court assumes that vaccinations will continue to be offered at Marinship Park.

[2] The fiberglass boat took about two hours to destroy. A fourth boat was also made of fiberglass and was scheduled for demolition on March 11 but, ultimately, was not destroyed that day.

Cal/OSHA permissible exposure limits (PEL) for fiberglass of 1.0 fiber/cc." Deignan Rpt. ¶ II.

Notably, the test results from the air samplers in the two sampling sites were consistent.

Plaintiffs' expert, Ms. Ray, was critical of Mr. Deignan's testing. Although there are questions as to whether Ms. Ray is qualified to express all of her opinions, the Court nevertheless took them into account – *i.e.*, it did not reject any of her opinions on the basis that she was not qualified to opine on the subject matter. Defendants have largely addressed Ms. Ray's criticisms. For example:

- Ms. Ray asserted that PCM testing was inadequate and TEM testing should have been done instead. In response, Mr. Deignan conducted TEM testing (on the remaining portions of the air samples he collected on March 11) and the results were not materially different.

- Ms. Ray maintained that the humidity on March 11 likely resulted in dust suppression. But the source on which she relied did not deal with fiberglass dust specifically. Moreover, the timeanddate.com website on which she relied showed that the average humidity for March 2021 is 64%, which is similar to the humidity on March 11. *See* https://www.timeanddate.com/weather/@5393605/historic?month=3&year=2021; *see also* https://www.timeanddate.com/weather/@5393605/historic?month=2&year=2021 (indicating average humidity of 68% for February 2021); https://www.timeanddate.com/weather/@5393605/historic?month=4&year=2021 (indicating average humidity of 66% for April). In other words, even if there were dust suppression on March 11 because of humidity, there would typically be dust suppression at Marinship Park because of similar humidity conditions. In any event, the study Ms. Ray cites showed that particulate concentration would be affected by, *e.g.*, several fold with a 20% change in humidity – nothing close to a thousand fold which is the difference between that found by Mr. Deignan and OSHA's PEL.

4

- Ms. Ray questioned the positioning of the air samplers – *e.g.*, the air samplers closer to boat crushing operation were pointed to the west, not the east, even though the wind that day was Northeasterly. But the air samplers near the rest rooms were pointed to the east, and the results of the two sets of samplers were consistent (*i.e.*, indicating that the difference in orientation was not material). Moreover, the air samplers had high volume pumps set to a range of 8 to 9 liters per minute of airflow, which indicates that positioning is not as significant as it might otherwise seem. Ms. Ray contended that the air pumps would still be in competition with the wind but she also admitted that she could not say which of the two would "win" out and further attributed "low counts" to humidity more than anything else.

- Ms. Ray argued that the air samplers were also inadequately positioned because they were placed at a height of 3.5' and not (in addition) 5' (the former being more representative of a person sitting or a child standing, the latter being more representative of an adult standing). But it is not clear that this difference in height was material given the specific testing being done – *e.g.*, outside instead of inside, with wind conditions, and with some distance between the source and the sampling site(s).

- Ms. Ray asserted that there should have been more than two sampling sites, but, although it may have been preferable to have multiple air monitors set up around the perimeter of the source, that does not mean that such was necessary. That the latter approach was taken for the Libby Asbestos Site does not mean that the same approach was needed at Marinship Park, at least not without more concrete evidence to establish such.

Finally, and most importantly, even if the Court were to credit all of Ms. Ray's criticisms, that still would not be enough to show that the conditions at Marinship Park are dangerous. Mr. Deignan's testing showed that the fibers present were one-thousandths (0.001) of the OSHA PEL for fiberglass. For Plaintiffs to show that there is danger at Marinship Park because of the boat

5

crushing operation, they would have to show that the testing done by Mr. Deignan was off by a *thousandfold*. The magnitude of the difference cannot be overcome by the claimed deficiencies in testing procedure. Implicitly recognizing such, Plaintiffs argued for the first time that the Court should not use the OSHA PEL standard as the appropriate measure for safety. But Plaintiffs offered no other standard to apply (other than hypothesizing that one could be developed given the specific situation at Marinship Park); moreover, the OSHA PEL standard is a reasonable proxy given that it is a gauge for safety in the workplace environment.

Accordingly, the Court concludes that Plaintiffs have failed to demonstrate that Marinship Park is not a safe location for the encampment. It therefore modifies the preliminary injunction such that Defendants are able to relocate individuals from Dunphy Park to Marinship Park.[3] The Court's ruling here is dependent on the City fulfilling all other conditions and safeguards described above. In addition, the Court's ruling here has no impact on the other part of the preliminary injunction related to day camping. That is, the Court continues to enjoin the day camping prohibition.

///

///

///

///

///

---

[3] In their papers in opposition to Defendants' motion, Plaintiffs argued for the first time forcing individuals to relocate to Marinship Park after already losing their boat homes and having those boat homes crushed would be traumatic, especially as this would place them near a boat-crushing operation. There are several problems with Plaintiffs' argument.

First, Plaintiffs never identified this as an issue during the initial preliminary injunction proceedings which makes the belated argument questionable. Second, not every person in the camp appears to claim this trauma – *i.e.*, not everyone in the camp appears to have had a boat destroyed. Third, even for those who have made the claim of trauma, it is conclusory in nature and the declaration of the licensed clinical social worker is similarly lacking in specifics. Fourth, it is not clear that this is the kind of danger that is contemplated by the case law on state-created danger. *See Kennedy*, 439 F.3d at 1061 & n.1 (discussing physical dangers such as private violence and harsh environmental conditions). Finally, while the Court does not foreclose the possibility that psychological trauma could be a state-created danger, the evidence of record – because it is conclusory in nature – is not sufficient to establish the level of danger suggested by the case law.

## II. <u>CONCLUSION</u>

For the foregoing reasons, the motion to modify the preliminary injunction is granted. Defendants, and those acting in concert with them, are enjoined from enforcing the day camping prohibition in Resolution No. 6009 but they are not enjoined from moving the encampment from Dunphy Park to Marinship Park.

This order disposes of Docket No. 27.

**IT IS SO ORDERED**.

Dated: May 26, 2021

_____
EDWARD M. CHEN
United States District Judge